POMERANTZ LLP
Jennifer Pafiti (SBN 282890)
Jeremy A. Lieberman (*pro hac vice application forthcoming*)
Austin P. Van (*pro hac vice application forthcoming*)
600 Third Avenue, 20th Floor
New York, New York   10016
Telephone:   (212) 661-1100
Email:            jpafiti@pomlaw.com
                      jaliberman@pomlaw.com
                      avan@pomlaw.com

*Counsel for Lead Plaintiffs*

— additional counsel on signature page —

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TERRENCE PETERS, Individually and On Behalf of All Others Similarly Situated,<br><br>                              Plaintiffs,<br><br>        v.<br><br>COLONY CREDIT REAL ESTATE, INC., F/K/A COLONY NORTHSTAR CREDIT REAL ESTATE, INC., RICHARD B. SALTZMAN, KEVIN P. TRAENKLE, SUJAN S. PATEL, NEALE W. REDINGTON, CATHERINE D. RICE, VERNON B. SCHWARTZ, DARREN J. TANGEN, JOHN E. WESTERFIELD, AND WINSTON W. WILSON,<br><br>                              Defendants. | **Case No. 2:20-CV-08305-PSG-PVC**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

AMENDED CLASS ACTION COMPLAINT:  Case No. 2:20-cv-08305-PSG-PVC

# TABLE OF CONTENTS

Page(s)

I.  INTRODUCTION ...................................................................................... 2

II.  JURISDICTION AND VENUE ................................................................ 4

III.  PARTIES .................................................................................................... 5

    A.  Lead Plaintiffs:  Colony Credit Investor Group ............................... 5

        1.  Philip Nuccetelli ...................................................................... 5

        2.  Alan Cohen ............................................................................... 5

        3.  Roger P. Martyna ..................................................................... 6

        4.  Terrence Peters ......................................................................... 6

    B.  Defendants ......................................................................................... 6

        1.  Colony Credit Real Estate, Inc. ("Colony Credit" or the
            "Company") ................................................................................ 6

        2.  Individual Defendants .............................................................. 7

IV.  SUBSTANTIVE ALLEGATIONS ......................................................... 10

    A.  Company Background ...................................................................... 10

        1.  Colony Credit Business .......................................................... 10

        2.  Formation of Colony Credit through 2018 Merger ................ 11

    B.  History of Row Hotel NYC Ownership Pre-Merger ....................... 12

    C.  Beginning in September 2017, the Hotel Contracted with the City of New
        York:  Guaranteed Occupancy in Exchange for Sheltering Homeless
        Guests ............................................................................................... 14

    D.  Beginning on February 1, 2018 in the Company's Registration Statement,
        the Company Overvalued the Hotel and Continued Grossly To Overvalue
        the Hotel Throughout the Class Period ............................................ 15

    E.  The Company's Overvaluation of the Row Hotel on May 18, 2018 .......... 17

i

F.   The Company's Continued Overvaluation of the Row Hotel on August 9, 2018 ....................................................................................................20

G.   As the Truth Emerges, the Company Takes a $35.1 Million Loss Provision on the Hotel Loans, Valuing the Hotel at $225.1 Million on November 9, 2018 ....................................................................................................22

H.   The Company Takes Another $18.8 Million Loss Provision on the Hotel Loans, Valuing the Hotel at $206.3 Million on March 1, 2019 ................25

I.   As of May 8, 2019, the Company's Valuation of the Hotel Remained Unchanged ...........................................................................................28

J.   On August 8, 2019, the Company Took a Staggering $104.3 Million Loan Loss Provision on the Hotel Loans, More Than Half of the Company's Most Recent Valuation, Valuing the Hotel at $102 Million ......................28

K.   On November 8, 2019, the Company Takes Another $50.0 Million Loss Provision on the Hotel Loans, Valuing the Hotel at $52 Million and Causing a Final Round of Losses to Investors ...........................................30

L.   The Company's Repeated Overvaluing of the Row Hotel NYC Was Material to Investors ...................................................................................31

V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..........................................................................................32

A.   Defendants' Materially False and Misleading Statements and Omissions in 2018 ....................................................................................................32

        1.   December 7, 2017 & February 1, 2018:  Registration Statement ...............................................................................32

        2.   May 15, 2018: 1Q18 10-Q ........................................................34

        3.   August 9, 2018:  2Q18 10-Q ....................................................35

        4.   August 7, 2018: 2Q18 Earnings Call .......................................36

        5.   November 9, 2018: 3Q18 10-Q ................................................36

        6.   November 6, 2018: 3Q18 Earnings Call .................................39

B.   Defendants' Materially False and Misleading Statements in 2019 ...........40

        1.   March 1, 2019: 2018 10-K .......................................................40

ii

2.      August 8, 2019: 2Q19 10-Q ................................................42

3.      August 8, 2019: 2Q19 Earnings Call....................................44

VI.    LOSS CAUSATION ....................................................................45

1.      November 6, 2018 ...............................................................45

2.      March 1, 2019 .....................................................................45

3.      August 9-12, 2019 ..............................................................45

4.      November 8-11, 2019 .........................................................46

VII.    ADDITIONAL SCIENTER ALLEGATIONS ...........................46

A.    Defendant Traenkle Told Investors that He Investigated the Company's Portfolio Thoroughly ....................................................46

B.    The Company Knew Of The Existence Of The DHS Safe Haven Social Services Site At The Hotel Since Before The Merger, But Never Disclosed Its Existence Or Effect On The Company's Expected NOI......................46

C.    Defendant Patel Resigned On The Same Date that the Company Recorded the First Impairment .................................................46

VIII.   CLASS ACTION ALLEGATIONS ..........................................47

IX.    NO SAFE HARBOR ................................................................50

X.     COUNT ONE  For Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5 (Against All Defendants)...........................................51

XI.    COUNT TWO  For Violations of Section 20(a) of the Securities Exchange Act of 1934 (Against the Individual Defendants) .......................................52

XII.    PRAYER FOR RELIEF ..........................................................53

XIII.   JURY TRIAL DEMANDED....................................................54

Court-appointed Lead Plaintiffs Philip Nuccetelli, Alan Cohen,[1] and Roger P. Martyna (collectively, "Plaintiffs," the "Colony Credit Investor Group" or "CCIG"), by and through undersigned counsel, bring this federal securities class action individually and on behalf of all other persons and entities (the "Class"[2]) that purchased or otherwise acquired the common stock of Colony Credit Real Estate, Inc. f/k/a Colony NorthStar Credit Real Estate, Inc. ("Colony Credit" or the "Company"), from February 1, 2018 through November 9, 2019, inclusive (the "Class Period"), including those who purchased or otherwise acquired such common stock issued in, in connection with, or traceable to the combination of Colony NorthStar, Inc. ("Colony NorthStar"), NorthStar Real Estate Income Trust, Inc. ("NorthStar I"), and NorthStar Real Estate Income II, Inc. ("NorthStar II"), on or about January 31, 2018 (the "Merger").

Plaintiffs' claims are brought upon personal knowledge as to their own acts, and upon information and belief as to all other matters, based upon, among other things, a review and analysis of (1) reports and documents filed by Colony Credit with the U.S. Securities & Exchange Commission ("SEC"); (2) reports issued by analysts covering or concerning Colony Credit and its business; (3) press releases, news articles, transcripts, and other public statements issued by or about Colony Credit, its business, and the

---

[1] Lead Plaintiff Alan Cohen pursues claims in this litigation both on his own behalf and on behalf of his sister, Elizabeth Cohen, pursuant to a valid assignment of Elizabeth Cohen's claims to Alan Cohen. *See* Mem. of P. & A. in Supp. of the Colony Credit Inv. Grp. [Mot.] for Appmt. as Lead Pl. & Approval of Lead Counsel 1 n.1, ECF No. 14 (Nov. 9, 2020) (citing Assignment dated Nov. 6, 2020, ECF No. 15-1 (Nov. 9, 2020), Ex. A to the Decl. of Jennifer Pafiti in Supp. of Mot. of the Colony Credit Inv. Grp. for Appmt. as Lead Pl. & Approval of Lead Counsel ("Pafiti Decl."), ECF No. 15 (Nov. 9, 2020)).

[2] The following are excluded from the Class:  (1) Defendants; (2) members of the immediate family of any Defendant who is a natural person; (3) any person who was an officer or director of the Company during the Class Period; (4) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (5) the Company's employee retirement and benefit plan(s), if any, and their participants or beneficiaries; and (6) the legal representatives, affiliates, subsidiaries, parents, heirs, heirs apparent, successors-in-interest, or assigns of any such excluded person or entity.

Defendants; (4) an investigation conducted by Plaintiffs' attorneys, including interviews with numerous confidential witnesses ("CWs"), including former Colony Credit employees; (6) consultations with experts; and (7) other publicly available information concerning Colony Credit, its business, and the allegations contained herein.

## I.   INTRODUCTION

1.   This is a federal securities class action against Colony Credit and nine of its senior-most executives seeking damages and other legal and equitable remedies to redress harms caused by Defendants' violations Sections 10(b) and 20(a) of the Exchange Act, *codified as amended*, 15 U.S.C. §§ 78j(b) & 78t(a), and of SEC Rule 10b–5, *codified as amended*, 17 C.F.R. § 240.10b–5.

2.   Colony Credit is a real estate investment trust ("REIT").  Among other things, the Company originates, acquires, and manages loans collateralized by commercial real estate ("CRE"), like hotels and shopping centers.  Colony Credit has claimed to be "one of the largest publicly traded CRE credit/mortgage REITs."

3.   Plaintiffs bring this Action because, throughout the Class Period, Colony Credit made false and materially misleading statements about the fair value of the hotel collateralizing four of its largest loans.  The company repeatedly informed investors that the value of this hotel, The Row NYC, was between two and five times what the Company knew the hotel to be worth.  The Company also omitted known trends affecting the value of the hotel.

4.   Colony Credit was created through a merger of three affiliated entities on January 31, 2018 (the "Merger").  In this combination, Colony Credit assigned a false, astronomical valuation to The Row NYC, and concealed the identity of this hotel and the severe financial problems it faced.  After only 15 months, the Company finally acknowledged a valuation of this hotel property that was half what they had previously disclosed, and after 18 months, that valuation sank by four fifths.

5.   The Company's series of false and misleading statements concerning the valuation of the hotel collateralizing four of its largest loans began with the Company's

first SEC filings, the Registration Statement issued in connection with the Merger.  The Registration Statement failed to state that:  (i) the valuation of the collateral securing the hotel property had deteriorated throughout 2017; (ii) the Company's valuation of the collateral at $260.2 million was overstated by over 400% in the Registration Statement because the collateral was worth only $50 million; (iii) the obligor on the notes securing the collateral had failed to make any payments on any such security instruments since April 2013; and (4) these problems created a substantial risk of loan impairments.

6.     The Company maintained this artificially-inflated valuation over the course of its first two quarterly reporting periods.  Each time, the Company failed to inform investors that the hotel's marketability and related expected cash flows were impaired, and would continue to be impaired, because the borrower had made no principal payments on the loans since April 2013.

7.     As the market learned of the nature and extent of the Company's dishonesty with each additional loan loss provision the Company recorded, each of which constituted a partial corrective disclosure that the Company had wildly overvalued the Hotel, the Company's share price plummeted, and the Plaintiffs were damaged.  Nevertheless, each time after the Company adjusted the valuation of the hotel property by recording additional loan loss provisions, the Company continued to communicate to investors that the collateral was worth vastly more than it was.

8.     On November 6, 2018, the Company noted a $35.1 million impairment on the hotel property loans, citing the borrower's failure to remit payments due for 90 days, but assured investors that the hotel was performing 70% better than the Company had projected it would perform at the start of 2018.  On this news, the price of Colony Credit's shares fell by $1.02 per share, to close at $16.97 per share on November 6, 2018.

9.     Then, on March 1, 2019, the Company took another $18.8 million impairment on the hotel property loans, this time based on the unaudited, aspirational valuation the seller's real estate broker assigned to the property.  Collectively, the

3

November 6, 2018 and March 1, 2019 loan loss provisions brought the new valuation to $206.3—a loss of roughly on fifth of its value in half a year.  On this news, the price of Colony Credit's shares fell by $0.94 per share, to close at $16.49 per share on March 1, 2019.

(a)     On August 8, 2019, the Company noted another loan loss provision on the hotel property loans as of June 30, 2019—this time, a staggering $104.3 million—reducing the Company's original valuation of the collateral by over one-half in just 18 months.   This time, the Company purported to blame a "significant deterioration" in the New York City hospitality industry—yet, analysts said that the lodging industry was flourishing and on pace for a record-setting year.  On this news, the Company's share price fell $2.00 per share, or more than 12%, over two consecutive trading sessions, to close at $14.05 per share on August 12, 2019.

(b)     Then, on November 8, 2019, the Company took yet another impairment of $50 million on the hotel property loans—pegged to the Company's updated valuation of the properties at $52 million, four-fifths of its original valuation. On this news, the price of Colony Credit's shares fell by $2.99 per share over two consecutive trading days, or nearly 21%, to close at $11.75 per share on November 8, 2019 and $11.29 per share on November 11, 2019.

(c)     In total, upon the disclosures of Defendants' wrongful acts and omissions, the market value of Colony Credit has plummeted by hundreds of millions of dollars.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Colony Credit's securities, Plaintiffs and other members of the Class suffered significant damages.

## II.     JURISDICTION AND VENUE

10.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) & 78t(a), and pursuant to the rules and regulations duly promulgated thereunder, including SEC Rule 10b–5, 17 C.F.R. § 240.10b–5.

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12.     Venue is proper in the Central District of California pursuant to Section 27 of the Exchange Act, *id.* § 78aa, because Defendants transact business in this District and because the Company's principal place of business is located in this District.  Venue is also proper in this District pursuant to 28 U.S.C. §§ 1391(b)–(d) because many of the acts and transactions that constitute the violations of law complained of in this Amended Complaint, including the dissemination to the public of materially false or misleading statements, occurred in this District.

13.     In connection with the acts, omissions, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, the facilities of the national securities markets, and interstate telephonic and digital communications.

## III.   PARTIES

### A.   Lead Plaintiffs:  Colony Credit Investor Group

#### 1.   Philip Nuccetelli

14.     Lead Plaintiff Philip Nuccetelli ("Nuccetelli"), a U.S. citizen domiciled in the State of New Jersey, purchased or otherwise acquired Colony Credit common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the corrective disclosures alleged herein, as set forth in the Joint Declaration in Support of Lead Plaintiff[s'] Motion ¶ 2, ECF No. 15-5 (Nov. 9, 2020) (the "Joint Decl."), attached as Ex. E to the Pafiti Decl. and incorporated herein by reference.

#### 2.   Alan Cohen

15.     Lead Plaintiff Alan Cohen ("Cohen"), a U.S. citizen domiciled in the State of Alabama, purchased or otherwise acquired Colony Credit common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the corrective disclosures alleged herein, as set forth in the Joint Decl. ¶ 3.

### 3. Roger P. Martyna

16. Lead Plaintiff Roger P. Martyna ("Martyna"), a U.S. citizen domiciled in the State of Washington, purchased or otherwise acquired Colony Credit common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the corrective disclosures alleged herein, as set forth in the Joint Decl. ¶ 4.

17. Nuccetelli, Cohen, and Martyna are collectively referred to herein as "Plaintiffs," the "Colony Credit Investor Group," or "CCIG."

### 4. Terrence Peters

18. Plaintiff Terrence Peters ("Peters") purchased or otherwise acquired Colony Credit common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the corrective disclosures alleged herein, as set forth in the Certification appended to the original complaint. *See* ECF No. 1-1 (Sept. 10, 2020).

### B. Defendants

### 1. Colony Credit Real Estate, Inc. ("Colony Credit" or the "Company")

19. Defendant Colony Credit Real Estate, Inc. ("Colony Credit" or the "Company") is a Maryland corporation, with executive offices located at 515 South Flower Street, 44th Floor, Los Angeles, California 90071. The Company's securities trade in an efficient market on the New York Stock Exchange under the ticker symbol "CLNC."

20. Defendant Colony Credit is liable for the acts of its executives, directors, officers, and agents at common law and under the doctrine of *respondeat superior* because all the wrongful acts and omissions complained of in this Amended Complaint were carried out during and within the scope of each such person's employment. The scienter of Colony Credit's executives, directors, officers, and agents is similarly imputed to Colony Credit under established agency principles.

## 2. Individual Defendants

21. Defendant Richard B. Saltzman ("Saltzman") was, at all relevant times, the Chairman of the Company's Board of Directors and the President and Chief Executive Officer of Colony Capital, Inc.  As of the date of this Amended Complaint, Saltzman is the Chairman of the Company's Board of Directors.  Saltzman is also the Chairman of the Board of Trustees of North Star Realty Europe, a director of Kimco Realty Corporation, a non-executive director of Equiem Services Limited, and a non-executive director of Louw & Company.  In the past, Saltzman was a Managing Director and Vice Chairman of Merrill Lynch's investment banking division.  Saltzman signed the Company's Registration Statement.  Saltzman also signed the Company's annual reports dated March 1, 2019 and February 28, 2020, both filed on SEC Form 10-K.

22. Defendant Kevin P. Traenkle ("Traenkle") was, at all relevant times, the President and Chief Executive Officer of the Company, as well as a director.  The Company announced Traenkle's resignation on February 27, 2020, effective two days later, on February 29, 2020.  Traenkle signed the Company's Registration Statement. Additionally, Traenkle signed the Company's annual reports dated March 1, 2019 and February 28, 2020, both filed on SEC Form 10-K.  Traenkle also signed the Company's quarterly reports dated May 18, 2018, August 9, 2018, November 9, 2018, May 9, 2019, and November 8, 2019, all filed on SEC Form 10-Q.  Further, Traenkle signed certifications pursuant to 17 C.F.R. §§ 240.13a–14(a) & 240.15(d)–14(a), promulgated under section 302 of the Sarbanes-Oxley Act of 2002, *codified as amended*, 15 U.S.C. § 7241, and pursuant to section 906 of the Sarbanes-Oxley Act of 2002, *codified as amended*, 18 U.S.C. § 1350, attesting to the veracity of the statements in each of the foregoing quarterly reports.

23. Defendant Sujan S. Patel ("Patel") was, at all relevant times until his resignation effective November 9, 2018, the Chief Financial Officer ("CFO") and Treasurer of the Company.  Patel signed the Company's Registration Statement. Additionally, Patel signed the Company's quarterly reports dated May 18, 2018 and

August 9, 2018, both filed on SEC Form 10-Q. Additionally, Patel signed certifications pursuant to 17 C.F.R. §§ 240.13a–14(a) & 240.15(d)–14(a), promulgated under section 302 of the Sarbanes-Oxley Act of 2002, *codified as amended*, 15 U.S.C. § 7241, and pursuant to section 906 of the Sarbanes-Oxley Act of 2002, *codified as amended*, 18 U.S.C. § 1350, attesting to the veracity of the statements in both of the foregoing quarterly reports.

24. Defendant Neale W. Redington ("Redington") was, at all relevant times beginning on November 9, 2018, the CFO and Treasurer of the Company. At all relevant times before November 9, 2018, Redington was the Company's Chief Accounting Officer ("CAO"). Redington signed the Company's Registration Statement. Additionally, Redington signed the Company's annual reports dated March 1, 2019 and February 28, 2020, both filed on SEC Form 10-K. Redington also signed the Company's quarterly reports dated May 18, 2018, August 9, 2018, November 9, 2018, May 9, 2019, and November 8, 2019, all filed on SEC Form 10-Q. Further, Redington signed certifications pursuant to 17 C.F.R. §§ 240.13a–14(a) & 240.15(d)–14(a), promulgated under section 302 of the Sarbanes-Oxley Act of 2002, *codified as amended*, 15 U.S.C. § 7241, and pursuant to section 906 of the Sarbanes-Oxley Act of 2002, *codified as amended*, 18 U.S.C. § 1350, attesting to the veracity of the statements in the aforementioned quarterly reports dated November 9, 2018, May 9, 2019, and November 8, 2019.

25. Defendant Catherine D. Rice ("Rice") was, at all relevant times, a director of the Company, and signed the Company's Registration Statement. Additionally, Rice signed the Company's annual reports dated March 1, 2019 and February 28, 2020, both filed on SEC Form 10-K.

26. Defendant Frank V. Saracino ("Saracino") was, at all relevant times beginning on November 9, 2018, the Company's CAO. At all relevant times prior to November 9, 2018, Saracino was the Managing Director of Colony Capital, Inc., "where his responsibilities include[d] financial accounting and reporting for Colony Capital

managed non-listed real estate investment trusts and registered closed-end investment reporting companies as Chief Financial Officer." Saracino signed the Company's Registration Statement. Additionally, Saracino signed the Company's annual reports dated March 1, 2019 and February 28, 2020, both filed on SEC Form 10-K. Saracino also signed the Company's quarterly reports dated November 9, 2018, May 9, 2019, and November 8, 2019, all filed on SEC Form 10-Q.

27. Defendant Vernon B. Schwartz ("Schwartz") was, at all relevant times, a director of the Company, and signed the Company's Registration Statement. Additionally, Schwartz signed the Company's annual reports dated March 1, 2019 and February 28, 2020, both filed on SEC Form 10-K.

28. Defendant Darren J. Tangen ("Tangen") was, at all relevant times, a director of the Company, and signed the Company's Registration Statement. Additionally, Tangen signed the Company's annual reports dated March 1, 2019 and February 28, 2020, both filed on SEC Form 10-K.

29. Defendant John E. Westerfield ("Westerfield") was, at all relevant times, a director of the Company, and signed the Company's Registration Statement. Additionally, Westerfield signed the Company's annual reports dated March 1, 2019 and February 28, 2020, both filed on SEC Form 10-K.

30. Defendant Winston W. Wilson ("Wilson") was, at all relevant times, a director of the Company, and signed the Company's Registration Statement. Additionally, Wilson signed the Company's annual reports dated March 1, 2019 and February 28, 2020, both filed on SEC Form 10-K.

31. All references to "Individual Defendants" in this Amended Complaint are to Saltzman, Traenkle, Patel, Redington, Rice, Saracino, Schwartz, Tangen, Westerfield, and Wilson, jointly and severally.

32. The Individual Defendants possessed the power and authority to control the contents of Colony Credit's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Colony

Credit's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Colony Credit, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

33.    All references to the "Defendants" in this Amended Complaint are to Colony Credit, Saltzman, Traenkle, Patel, Redington, Rice, Schwartz, Tangen, Saracino, Westerfield, and Wilson, jointly and severally.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Company Background

#### 1.    Colony Credit Business

34.    Colony Credit is a commercial real estate ("CRE") credit real estate investment trust ("REIT") that manages a portfolio of CRE senior mortgage loans, mezzanine loans, preferred equity, debt securities, and net-leased properties principally in the United States. A REIT is a corporation, trust, or association that invests in certain income-producing interests in one or more real properties or certain other qualifying income-producing real estate-related assets. REITs often manage and operate the real properties in which they hold an interest.

35.    The Company conducts almost all of its activities and holds nearly all of its assets and liabilities through an operating subsidiary, Credit RE Operating Company, LLC (the "OP"), of which the Company owns 97.6% as the OP's sole managing member.

### 2. Formation of Colony Credit through 2018 Merger

36.    Colony Credit was incorporated in Maryland on August 23, 2017 under its original name, Colony NorthStar Credit Real Estate, Inc. ("CNCRE"), and originally wholly owned by Colony Northstar Inc. ("Colony Northstar").

37.    On or about January 31, 2018, CNCRE merged with NorthStar I and NorthStar II (the "Merger").

38.    NorthStar I and NorthStar II were REITs with diversified portfolios of CRE debt, including select equity and securities investments, predominantly in the U.S. Their debt investments included first mortgage loans, subordinate mortgage and mezzanine loans, and participations in such loans and preferred equity interests through real estate private equity funds.  Their CRE securities primarily consisted of commercial mortgage-backed securities.

39.    The Chairman, CEO, and President of NorthStar I and Northstar II was Daniel R. Gilbert.

40.    The Merger specifically consisted of a combination of substantially all of the assets and liabilities of NorthStar I and all of the assets and liabilities of NorthStar II, together with a select portfolio of Colony Northstar's majority-owned subsidiary Colony Capital Operating Company, LLC ("CLNY OP") assets and liabilities (the "CLNY OP Contributed Entities"), and a select portfolio of assets and liabilities of NRF RED REIT Corp. ("RED REIT"), an indirect subsidiary of CLNY OP (the "RED REIT Contributed Entities").[3]

---

[3] The Merger consisted of the following steps: (i) CLNY OP received approximately 44.4 million shares of the Company's Class B-3 common stock in exchange for the CLNY OP Contributed Entities, and RED REIT received approximately 3.1 million common membership units in the OP in exchange for the RED REIT Contributed Entities; (ii) NorthStar I merged with and into the Company, with stockholders of NorthStar I (including Colony Capital, Inc. and its affiliates) receiving 0.3532 shares of the Company's Class A common stock for each share of NorthStar I common stock they owned, for a total of approximately 42.1 million shares of the Company's Class A common stock; (iii) NorthStar II merged with and into the Company, with stockholders of NorthStar II (including Colony Capital, Inc. and its affiliates) receiving 0.3511 shares

AMENDED CLASS ACTION COMPLAINT:  Case No. 2:20-cv-08305-PSG-PVC

41.     Upon the Merger, Defendant Traenkle became CEO and Defendant Patel became CFO of the Company.

42.     On June 25, 2018, the merged entity CNCRE changed its name to Colony Credit Real Estate, Inc. ("Colony Credit" or "the Company").

**B.     History of Row Hotel NYC Ownership Pre-Merger**

43.     The Row Hotel NYC (the "Hotel") is an historic hotel located at 700 Eighth Avenue, one block west of Times Square, in New York City.  The Hotel has 27 stories and 1,331 hotel rooms.  The Hotel opened on or about February 13, 1928 as the Hotel Lincoln.  In September 1957, the Hotel was renamed the Manhattan Hotel and remodeled.  Six years later, the Hotel changed hands again and, between 1964 through 1980, it was operated as the Royal Manhattan.  In 1980, the Milstein family purchased the Hotel and renamed it the Milford Plaza Hotel.  As the Milford Plaza Hotel, the property was known informally as the "Lullaby of Broadway."

44.     In February 2010, Rockpoint Group ("Rockpoint") and Highgate Holdings, Inc. ("Highgate") purchased the Hotel for approximately $200 million.  Three years later, in February 2013, the property was renamed The Milford New York Hotel and partitioned into three parcels: (1) the land (the "Land"), (2) the hotel units collectively (the "Hotel Property"), and (3) the retail units (the "Retail Property").

45.     On April 30, 2013, two NorthStar entities, NorthStar MP Senior Loan, LLC (a wholly-owned subsidiary of NorthStar I) ("Northstar LLC") and Colony NorthStar, originated a $255 million senior mortgage loan to Rockpoint and Highgate

---

of the Company's Class A common stock for each share of NorthStar II common stock they owned, for a total of approximately 40.4 million shares of the Company's Class A common stock; and (iv) Colony Credit contributed to its operating company: (a) the CLNY OP Contributed Entities, (b) the equity interests of NorthStar Real Estate Income Trust Operating Partnership, LP ("NorthStar I OP"), the operating partnership of NorthStar I, and (c) the equity interests of NorthStar Real Estate Income Operating Partnership II, LP (NorthStar II OP"), the operating partnership of NorthStar II, and in connection with that transaction received approximately 126.9 million OP Units.

(the "April 2013 Mortgage & Loan Agreement").  Pursuant to the April 2013 Mortgage & Loan Agreement, NorthStar LLC and Colony NorthStar collectively acquired a 35% leasehold interest in the Hotel Property and Retail Property, along with certain rights in the revenues generated from each.

46.    NorthStar LLC's rights in the April 2013 Mortgage & Loan Agreement were assigned and re-assigned to different entities—all owned or controlled by NorthStar I or Colony NorthStar—between 2013 and 2018.[4]  On the day prior to the Merger, NorthStar I was the ultimate owner of NorthStar LLC's original leasehold interests in the Hotel pursuant to the April 2013 Mortgage & Loan Agreement.  In the Merger, the Company acquired NorthStar I's leasehold interests in the Hotel, and retained those interests throughout the Class Period.

---

[4] On September 3, 2013, Northstar LLC assigned its rights in the April 2013 Mortgage & Loan Agreement to NRFC Participator, LLC.  The same day, on September 3, 2013, NRFC Participator, LLC assigned all of its rights in the April 2013 Mortgage & Loan Agreement to U.S. Bank National Association, as Trustee for the Beneficial Owner of the NorthStar 2013 1 Grantor Trust, Series A.  Colony NorthStar was the ultimate Beneficial Owner of the NorthStar 2013 1 Grantor Trust, Series A between September 3, 2013 and February 26, 2017, through Colony Capital Operating Company, LLC, Colony Capital OP Subsidiary, LLC, Colony Capital Investment Holdco, LLC, NorthStar Asset Management Group, LLC, and NS Servicing II, LLC.

On February 27, 2017, U.S. Bank National Association, as Trustee for the Beneficial Owner of the NorthStar 2013 1 Grantor Trust, Series A, assigned all of its rights in the April 2013 Mortgage & Loan Agreement to MS Loan NT I, LLC.  On July 11, 2017, MS Loan NT I, LLC purported to assign all of its rights in the April 2013 Mortgage & Loan Agreement to NS Income DB Loan, Series VI, A Series of NS Income DB Loan, LLC.  Between February 27, 2017 and July 10, 2017, the April 2013 Mortgage & Loan Agreement was owned by NorthStar I, through NorthStar Real Estate Income Trust Operating Partnership, LP, the sole member of MS Loan NT-I, LLC.  Between July 11, 2017 and June 3, 2018, the April 2013 Mortgage & Loan Agreement was also owned by NorthStar I, through NorthStar Real Estate Income Trust Operating Partnership LP, the sole member of NS Income DB Loan, LLC.

Pursuant to a document filed with the New York City recorder on April 30, 2020, on June 4, 2018, NS Income DB Loan, Series VI, A Series of NS Income DB Loan, LLC, assigned all of its rights in the April 2013 Mortgage & Loan Agreement to CLNC Credit SL MLFD, LLC.  Colony Credit is the sole member of CLNC Credit SL MLFD, LLC.

**C.    Beginning in September 2017, the Hotel Contracted with the City of New York:  Guaranteed Occupancy in Exchange for Sheltering Homeless Guests**

47.    Beginning in September 2017, the New York City Department of Homeless Services ("DHS") began to offer commercial hotels $220 per night per room as part of its "Turning the Tide" program to address street homelessness in New York City.  The Hotel participated in this program.

48.    From December 2017 through August 2018, the Hotel made 46 of its guest rooms available to the Traveler's Safe Haven, Urban Pathways, Safe Haven program pursuant to a contract with the New York City Department of Homeless Services ("DHS").

49.    Beginning in September 2018 and continuing through the end of the Class Period, the Hotel made 50 of its guest rooms available to the Traveler's Safe Haven, Urban Pathways, Safe Haven program, pursuant to two contracts with DHS.

50.    According to DHS:

Safe Havens are facilities with physical and program characteristics specifically targeted toward homeless individuals living on the streets who may be resistant to accepting other services, including traditional shelters. Safe Havens are equipped with on-site services and outreach staff who work closely with clients to deepen relationships, help stabilize their lives, and, ultimately, encourage them to transition further off the streets and into permanent housing.

51.    Many Hotel guests not participating in the Turning the Tide program reacted negatively to the Hotel's participation.  On October 11, 2017, a guest left a negative review of the Hotel on Yelp, stating, "The taxpayers are now paying for homeless people to live in this hotel.  I will never stay here again."[5]  On November 12, 2019, a different guest offered the following review:

---

[5]                                      https://www.yelp.com/biz/row-nyc-new-york2?hrid=31OjX6mHhplq5ryWTvoSAw&utm_campaign=www_review_share_popup&utm_medium=copy_link&utm_source=(direct).

Do not stay there!  This hotel houses a HOMELESS SHELTER on site.  I tried to get my money back after realizing this but they denied the request. I paid for a run down hotel with guards and a lobby full of people milling about.  Again, don't stay there.  This is fraud.  I booked thru Priceline and they too, declined my request.  And they had the audacity to give 4 stars to this place.[6]

### D. Beginning on February 1, 2018 in the Company's Registration Statement, the Company Overvalued the Hotel and Continued Grossly To Overvalue the Hotel Throughout the Class Period

52. Beginning in the Registration Statement and in each subsequent disclosure throughout the Class Period, the Company valued the Hotel when determining its value as loan collateral at between two and five times its fair value, or the value of the Hotel as determined using a discounted cash flow analysis based on the Hotel's operating results.

53. In defining "fair value of loans receivable" in the Registration Statement and Prospectus issued in connection with the Merger, the Company stated:

The fair value of loans receivable was determined by comparing the current yield to the estimated yield for newly originated loans with similar credit risk or the market yield at which a third party might expect to purchase such investment or based on DCF projections of principal and interest expected to be collected, **which include** consideration of borrower or sponsor credit, as well as **operating results of the underlying collateral**.

54. The Company also explained that it routinely analyzed the operating results of the properties collateralizing its loans to assess whether to record a loan impairment.

Impairment and Allowance for Loan Losses—On a periodic basis, we analyze the extent and effect of any credit migration from underwriting and the initial investment review associated with the performance of a loan and/or value of its underlying collateral, financial and operating capability of the borrower or sponsor, as well as amount and status of any senior loan, where applicable. Specifically, **operating results of collateral properties** and any cash reserves are analyzed and used to assess whether cash from operations are sufficient to cover debt service requirements currently and

---

[6] https://www.yelp.com/biz/row-nyc-new-york-2?hrid=oqDHvZVjUf0IVd4ANycrwA&utm_campaign=www_review_share_popup&utm_medium=copy_link&utm_source=(direct).

into the future, ability of the borrower to refinance the loan, liquidation value of collateral properties, financial wherewithal of any loan guarantors as well as the borrower's competency in managing and operating the collateral properties.

55.    The Company further assured investors with respect to Northstar I properties:

It was determined that the **current yields for NorthStar I's** and NorthStar II's **loans receivable approximated current market yields**, and **therefore fair value for the loans receivable was deemed to equal each loan's outstanding principal amount**, plus the undiscounted value of any contractual exit fees associated with the loan.[7]

56.    That is, in the Registration Statement and Prospectus, the Company implied that the value of the Hotel was equal to the Hotel loans' outstanding principal amount, which at the time was approximately $260 million.  The Company also made clear that one proper method of calculating the fair value of collateral underlying the Company's loans is with reference to the operating results of the underlying collateral.  Indeed, the most widely used method for valuing CRE is with reference to the operating results of the underlying collateral.  The Company recognized that a proper valuation of real estate like the Hotel should be "based on historical and projected income"[8] and an analysis of "occupancy trends, lease or room rates."[9] The Company noted "Hotel operating income includes room revenue, food and beverage sales and other ancillary services."[10]

---

[7] Colony NorthStar Credit Real Estate, Inc., *Notes to the Unaudited Pro Forma Condensed Combined Financial Statements*, Index to Financial Statements, Prospectus, SEC Form 424B3 at F-16 (Dec. 6, 2017).

[8] Colony NorthStar Credit Real Estate, Inc., *Summary*, SEC Form 424B3 at 67 (Dec. 6, 2017).

[9] Colony NorthStar Credit Real Estate, Inc., *Report of Independent Registered Public Accounting Firm*, Annex H-1, Prospectus, SEC Form 424B3 at H-1-21 (Dec. 6, 2017).

[10] Colony NorthStar Credit Real Estate, Inc., *Report of Independent Registered Public Accounting Firm*, Annex H-1, Prospectus, SEC Form 424B3 at H-1-21 (Dec. 6, 2017).

57.     The Company also knew that DHS intended to continue the Safe Haven homeless services contract.  Indeed, the Safe Haven program had used the [Hotel] since September, and both the community board and local elected officials were notified—but not the public and not those staying at the hotel.  The Company also knew that DHS's planned phaseout of commercial hotels [was] not expected until 2023.   Yet, the Company never disclosed that the Hotel was being used as a homeless shelter.

**E.     The Company's Overvaluation of the Row Hotel on May 18, 2018**

58.     On May 18, 2018, the Company reported its earnings results for the period ended March 31, 2018, for the first quarter of 2018 ("1Q18") on a Quarterly Report on SEC Form 10-Q (the "1Q18 10-Q").  Therein, after acknowledging for the first time that the borrowers on the Hotel loans had failed to make its interest payment, the Company stated that the value of the Hotel was $260.2 million, in stating that the "fair value" of the Hotel was equal to the outstanding principal loan balances.   Specifically, the Company disclosed i that

> In March 2018, the borrower on the Company's $260.2 million NY hospitality loan failed to make its interest payment.  The Company has placed the loan on non-accrual status and has commenced discussions with the borrower to resolve the matter.  **No provision for loan loss was recorded during the three months ended March 31, 2018 as the Company believes sufficient collateral value exists to cover the outstanding loan balances**.

59.     In describing the factors that the Company considers to determine whether to note an impairment or allowance for loan losses, the Company stated in the 1Q18 10-Q that "[l]oans are considered to be impaired when it is probable that the Company will not be able to collect all amounts due in accordance with contractual terms of the loans, including consideration of underlying collateral value.  Allowance for loan losses represents the estimated probable credit losses inherent in loans held for investment at balance sheet date."  Additionally, the Company stated in the 1Q18 10-Q that

On a periodic basis, the Company analyzes the extent and effect of any credit migration from underwriting and the initial investment review associated with the performance of a loan and/or **value of its underlying collateral**, **financial and operating capability of the borrower** or sponsor, as well as amount and status of any senior loan, where applicable. Specifically, **operating results of collateral propertie**s and any cash reserves **are analyzed and used to assess whether cash from operations are sufficient to cover debt service requirements currently and into the future**, **ability of the borrower** to refinance the loan, **liquidation value of collateral** properties, financial wherewithal of any loan guarantors as well as the **borrower's competency in managing and operating the collateral** properties. **Such analysis is performed at least quarterly, or more often as needed when impairment indicators are present.**

60.     Additionally, the Company's 1Q18 10-Q represented that "[t]here were no loans modified as TDRs during the three months ended March 31, 2018 and year ended December 31, 2017."   In the 1Q18 10-Q, the Company defined "Troubled Debt Restructuring ('TDR')" as:

A loan with **contractual terms modified in a manner that grants concession to the borrower who is experiencing financial difficulty** is classified as a TDR.  Concessions could include term extensions, payment deferrals, interest rate reductions, principal forgiveness, forbearance, or other actions designed to maximize the Company's collection on the loan. **As a TDR is generally considered to be an impaired loan**, it is measured for impairment based on the Company's allowance for loan losses methodology.

61.     Furthermore, the 1Q18 10-Q explains that

For loans held for investment, net, fair values were determined: (i) by comparing the current yield to the estimated yield for newly originated loans with similar credit risk **or** the market yield at which a third party might expect to purchase such investment; **or** (ii) **based on discounted cash flow projections of principal and interest expected to be collected, which includes consideration of the financial standing of the borrower or sponsor as well as operating results of the underlying collateral** . . . .

62.     The Company made similar disclosures in its quarterly and annual filings throughout the Class Period.

63.     In the Company's 1Q18 10-Q, the Company again represented to investors that an appropriate means of valuing collateral assets, including the Hotel, was through consideration of the operating results of the underlying collateral.   Accordingly, the $260.2 million valuation of the Hotel in the 1Q18 10-Q represented to investors that the Hotel generated sufficient revenues and net incomes from operations ("NOI") to cover the $260.2 million balance on the loans.

64.     In fact, the Company demonstrably knew as of May 18, 2018 that the fair value of the Hotel, based on its operating performance, was less than approximately $132 million, and likely far less.  As explained below, at teleconferences in August and November 2018, Defendant Patel stated that "2018 projected NOI [net operating income] has increased approximately 70% from the beginning of the year."   Yet in November 2018, at the same time the Company claimed to be outperforming by 70% the projected income estimates made prior to January 2018, the Company recorded a $35 million provision for loan losses for the four loans secured by the Hotel.  This statement implies that as of January 2018, the Company knew the Hotel to be performing at a rate that, if increased by 70%, would amount to a valuation of the Hotel that would result in a $35 million impairment.   Accordingly, by arithmetic, the Company knew in January 2018 that the Hotel, valued based on the Hotel's performance, was less than approximately $132 million. [11]

-------------------

[11] The calculation runs as follows.  $260.2 million less a $35 million write-down equals $225.2 million, the minimum value the Company claimed the Hotel to be worth in November 2018, when the hotel was performing 70% above the level predicted as of January 2018.  To solve for the value of Hotel (based on income) in January 2018, one may solve for x in an equation where x represents the value of the Hotel (based on income) that, when increased by 70%, equals $225.2 million, *i.e.*, the equation $1.70x = \$225.2$ million.  Solving for x, x is equal to $225.2 million divided by 1.7, which is equal to $132.47 million.

65.     Moreover, the borrower had never made any payments on the principal balance of the loans since undertaking the obligations in April 2013, and as of, at the latest, the first quarter of 2018, the borrower was failing even to make interest payments.   The Company also knew that DHS intended to continue the Safe Haven homeless services contract and that DHS's planned phaseout of commercial hotels was not expected until 2023."   Yet the Company never disclosed that the Hotel was used as a homeless shelter.   Likewise, Company's statement, that "sufficient collateral value exists to cover the outstanding balances," omitted to state that the Company had not sought independent appraisal of the Hotel's value.

66.     Investors had no way of discovering the false and materially misleading statements underlying the Company's valuation of the Hotel as of May 18, 2018 because the Company never disclosed to investors that the Hotel was the collateral securing the "NY hospitality loan."

### F.     The Company's Continued Overvaluation of the Row Hotel on August 9, 2018

67.     On August 9, 2018, the Company reported its earnings results for the period ended June 30, 2018, for the second quarter of 2018 ("2Q18") on a Quarterly Report on SEC Form 10-Q (the "2Q18 10-Q").   Therein, the Company stated again that the value of the Hotel was $260.2 million or $261.1 million,[12] in stating that there was sufficient collateral value to cover the outstanding principal loan balances.   Specifically, the Company disclosed that:

> In March 2018, the borrower on the Company's four NY hospitality loans with an unpaid principal balance of $260.2 million failed to make its interest payment.   The Company has placed the loans on non-accrual status and has commenced discussions with the borrower to resolve the matter. Interest income is recognized on a cash basis.   **No provision for loan loss was recorded during the three and six months ended June 30, 2018 as**

---

[12] Throughout the 2Q18 10-Q, the Company ascribes inconsistent values to the Hotel loans.

**the Company believes sufficient collateral value exists to cover the outstanding loan balances**.

68.     On August 7, 2018, during a conference call with investors to discuss the Company's second quarter 2018 earnings results, Defendant Patel stated:

> Ultimately, we believe this asset's performance will improve as the New York City hospitality market emerges from recent oversupply issues. Through the first six months of this year, the asset is already seeing positive top and bottom line growth, and its 2018 projected NOI has increased approximately 70% from the beginning of the year.

69.     Additionally, the 2Q18 10-Q represented that "[t]here were no loans modified as TDRs during the six months ended June 30, 2018 and year ended December 31, 2017."

70.     In the 2Q18 10-Q, the Company included the below table that, according to Colony Credit, "provides an aging summary of loans and preferred equity held for investment at carrying values before allowance of loan losses, if any (dollars in thousands):"

| | Current or Less Than 30 Days Past Due (1)(2)(3) | 30-59 Days Past Due | 60-89 Days Past Due (3) | 90 Days or More Past Due (3) | Total Loans |
|---|---|---|---|---|---|
| June 30, 2018 (Unaudited) | $   1,597,382 | $          — | $     118,557 | $     363,195 | $   2,079,134 |
| December 31, 2017 | 1,122,366 | 144,241 | 7,929 | 26,765 | 1,301,301 |

(1)  At June 30, 2018, includes four loans to two separate borrowers consisting of two current or less than 30 days past due and two 60-89 days past due loans held for investment. Subsequent to June 30, 2018 , extensions for the four loans with a total combined carrying value of $79.9 million were executed while the Company continues discussions with the borrowers to work towards a settlement or other alternative resolution.

(2)  Subsequent to June 30, 2018 , a senior mortgage loan with a carrying value of $75.6 million became real estate owned through a foreclosure sale. See Note 18, "Subsequent Events," for further information.

(3)  At June 30, 2018 , 90 days or more past due loans includes four loans to the same borrower with combined carrying value of $ 261.1 million on non-accrual status. All other loans in this table remain current on interest payments.

(highlights added).   The Company included similar tables in its quarterly and annual filings throughout the Class Period.

71.     For the reasons explained above, the Company demonstrably knew as of May 18, 2018 that the fair value of the Hotel, based on its operating performance, was not approximately $260 million, but rather was less than approximately $132 million, and likely far less.   As explained above, in November 2018, at the same time the

Company claimed to be outperforming by 70% the projected income estimates made prior to January 2018, the Company recorded a $35 million provision for loan losses for the four loans secured by the Hotel.  This statement implies that the Company knew in January 2018 that the value of the Hotel, valued based on the Hotel's performance, was less than approximately $132 million.  The Company likewise was fully aware of the borrowers' inability to make interest payments, as well as the continued use of the Hotel as a homeless shelter.

   **G.   As the Truth Emerges, the Company Takes a $35.1 Million Loss Provision on the Hotel Loans, Valuing the Hotel at $225.1 Million on November 9, 2018**

   72.   On November 9, 2018, the Company reported its earnings results as of September 30, 2018, for the third quarter of 2018 ("3Q18") in its Quarterly Report on SEC Form 10-Q (the "3Q18 10-Q").  Therein, the Company stated that "[d]uring the third quarter of 2018, the Company recorded a $35.1 million provision for loan loss." According to the Company's 3Q18 10-Q:

> Significant developments affecting our business and results of operations for the three months ended September 30, 2018 **and through November 8, 2018** include . . . Recorded [*sic*] a $35.1 million provision for loan loss on four NY hospitality loans following discussions with the borrower which did not progress as anticipated and led us to explore additional options for a potential resolution, including a recapitalization and earlier than expected receipt and sale of collateral.

   73.   In its discussion of the status of the Hotel loans in the 3Q18 10-Q, the Company stated that:

> In March 2018, the borrower on our four NY hospitality loans with an unpaid principal balance failed to make its interest payments.  **These four loans are secured by the same collateral**.  We placed the loans on non-accrual status and commenced discussions with the borrower to resolve the matter.
>
> [. . .]

During the third quarter of 2018, discussions with the borrower did not progress as anticipated which has led us to exploring additional options for resolution.   We prepared a weighted average probability analysis of potential resolutions, which included a recapitalization and earlier than expected receipt and sale of collateral.   Based on this analysis, we recorded a $35.1 million provision for loan loss on the four NY hospitality loans during the third quarter of 2018.

74.   As it did in the 1Q18 and 2Q18 10-Qs, the Company described the factors that it considered to determine whether to note an impairment or allowance for loan losses in the 3Q18 10-Q:  "Loans and preferred equity investments are considered to be impaired when it is probable that the Company will not be able to collect all amounts due in accordance with contractual terms of the loans and preferred equity investments, including consideration of underlying collateral value."  As it did in the 1Q18 and 2Q18 10-Qs, the Company stated in the 3Q18 10-Q that:

On a periodic basis, the Company analyzes the extent and effect of any credit migration from underwriting and the initial investment review associated with the performance of a loan and preferred equity investment and/or value of its underlying collateral, financial and operating capability of the borrower or sponsor, as well as amount and status of any senior loan, where applicable.  Specifically, **operating results of collateral properties** and any cash reserves **are analyzed and used to assess whether cash from operations are sufficient to cover debt service requirements currently and into the future**, **ability of the borrower** to refinance the loan, **liquidation value of collateral properties**, and financial wherewithal of any loan guarantors, as well as the **borrower's competency in managing and operating the collateral** properties.  **Such analysis is performed at least quarterly**, **or more often as needed when impairment indicators are present**.

75.   The Company's 3Q18 10-Q does not state that the Company undertook any independent analysis of the collateral underlying the four Hotel loans, or that it relied on a third-party appraisal of the collateral underlying the four Hotel loans, in deciding to further impair the loans.

76.     During a November 6, 2018 teleconference to discuss the Company's 3Q18 earnings results, despite admitting that the Company "recorded a $35 million provision for loan losses for the four loans secured by [the Hotel]," Defendant Patel attempted to reassure investors that no further loan loss provisions were likely by stating that:

> As New York City hotel room additions are beginning to be absorbed, we continue to be optimistic on the New York City lodging market recovery looking ahead to 2019 and 2020.   And the forecasted NOI for this particular hotel is up approximately 70% from its initial 2018 budget.

77.     By its own definitions, the Company's $225.1 million valuation of the Hotel in the 3Q18 10-Q represented to investors that the "borrower or sponsor" of the Hotel loans, together with the Hotel's "operating results," generated sufficient revenues and net incomes from operations ("NOI") to cover at least $225.1 million of the outstanding principal balance on the Hotel loans.

78.     In fact, for the reasons explained above, the Company demonstrably knew as of November 6, 2018 that the fair value of the Hotel, based on its operating performance, was less than approximately $132 million, and likely far less.   As explained above, in November 2018, at the same time the Company claimed to be outperforming by 70% the projected income estimates made prior to January 2018, the Company recorded a $35 million provision for loan losses for the four loans secured by the Hotel.   This statement implies that the Company knew in January 2018 that the value of the Hotel, valued based on the Hotel's performance, was less than approximately $132 million.   The Company likewise was fully aware of the borrowers' inability to make interest payments, as well as the continued use of the Hotel as a homeless shelter.

AMENDED CLASS ACTION COMPLAINT:  Case No. 2:20-cv-08305-PSG-PVC

### H.    The Company Takes Another $18.8 Million Loss Provision on the Hotel Loans, Valuing the Hotel at $206.3 Million on March 1, 2019

79.    On March 1, 2019, the Company reported its earnings results for the fourth quarter of 2018 ("4Q18") in its Annual Report on SEC Form 10-K (the "2018 10-K"). Therein, the Company stated that:

> During the fourth quarter of 2018, the borrower entered into a listing agreement with a real estate brokerage firm and as a result, we believe the sale of the underlying collateral and repayment of the four loans from the sales proceeds is the most likely outcome.  As such, we recorded an additional $18.8 million of provision for loan loss on the four NY hospitality loans in 2018 to reflect the estimated proceeds to be received from the borrower following the sale.

80.    In the 2018 10-K, the Company included the below table that, according to Colony Credit, "provides an aging summary of loans and preferred equity held for investment at carrying values before allowance for loan losses, if any (dollars in thousands):"

| | Current or Less Than 30 Days Past Due | 30-59 Days Past Due (1) | 60-89 Days Past Due (2) | 90 Days or More Past Due (3)(4) | Total Loans |
|---|---|---|---|---|---|
| December 31, 2018 | $    1,632,817 | $    58,751 | $    42,995 | $    395,262 | $    2,129,825 |
| December 31, 2017 | 1,122,366 | 144,241 | 7,929 | 26,765 | 1,301,301 |

(1)    Subsequent to December 31, 2018 , the Company and the borrower on one loan with a carrying value of $21.8 million included in 30-59 days past due reached an agreement that extended the loan's maturity until April 2019 . The loan was in maturity default as of December 31, 2018 .
(2)    At December 31, 2018 , 60-89 days past due loans consists of two loans to the same borrower and secured by the same collateral which were refinanced in January 2019 into a $37.0 million senior mortgage loan.
(3)    At December 31, 2018 , 90 days or more past due loans includes four loans to the same borrower and secured by the same collateral with combined carrying value before allowance for loan losses of $ 258.1 million on non-accrual status. All other loans in this table remain current on interest payments.
(4)    At December 31, 2018 , 90 days or more past due loans includes four loans to the same borrower and secured by the same collateral with a combined carrying value before allowance for loan losses of $137.1 million . The Company foreclosed on these four loans in January 2019 .

(highlights added).

81.    In the 2018 10-K, the Company described the factors that it considered to determine whether to record an impairment or allowance for loan losses in 4Q18: "Loans and preferred equity investments are considered to be impaired when it is probable that the Company will not be able to collect all amounts due in accordance with contractual terms of the loans and preferred equity investments, including consideration of underlying collateral value."    The Company again stated that it

considered "operating results of collateral properties" "to assess whether cash from operations are sufficient to cover debt service requirements currently and into the future."

82.    The Company's 2018 10-K does not state that the Company undertook any independent analysis of the collateral underlying the four Hotel loans, or that it relied on a third-party appraisal of the collateral underlying the four Hotel loans, in deciding to further impair the loans.

83.    During a February 28, 2019 teleconference with investors, Defendant Redington attempted to forestall investors' concerns, stating that

> As New York City hotel room additions are beginning to be absorbed, we continue to be optimistic on the New York City lodging market recovery and the ability to exit this recent credit impaired asset.

84.    Defendant Traenkle likewise knowingly misled investors to believe that the risk of further impairments was very low.   In response to an investor's question concerning the Hotel loans during the February 28, 2019 teleconference with investors, Defendant Traenkle stated:

> [The Hotel's] earnings are a little bit lumpy, . . . [s]o, we thought it was in the best interest just to kind of clean up some of the noise around the quarter-to-quarter kind of market-to-markets that we're seeing is just to sell the portfolio [*sic*].  And, in fact, [the Hotel] **is for sale right now**.  **We have a lot of interest**.  There's a number of parties that have been in the data room.  And yeah, we think **it's going to trade at a number that will be acceptable to us**.  And I think it's going to be able to kind of repatriate a lot of capital that we'll be able to redeploy into much higher yielding assets.  And we'll put this behind us and we'll be much better off for it.
>
> [. . .]
>
> Yeah.  So, **the risks are very low**.

AMENDED CLASS ACTION COMPLAINT:  Case No. 2:20-cv-08305-PSG-PVC

85.    Defendant Traenkle's remarks during the February 29, 2019 earnings teleconference represented that it was "in the best interest" of the Company to "sell the [Hotel]" because its "earnings [were] a little bit lumpy."

86.    The borrower, Rockpoint Group, and Colony Credit listed the Hotel for sale on or about February 28, 2019, at an asking price of $220 million.[13]

87.    The Company knew as of March 1, 2019 that the Hotel was performing at a rate that would require a loan loss provision well in excess of $53.9 million and that the fair value of the Hotel was far less than $206.3 million.  For the reasons explained above, the Company demonstrably knew by January 2018 that the fair value of the Hotel, based on its operating performance, was less than approximately $132 million, and likely far less.  As explained above, in November 2018, at the same time the Company claimed to be outperforming by 70% the projected income estimates made prior to January 2018, the Company recorded a $35 million provision for loan losses for the four loans secured by the Hotel.  This statement implies that the Company knew as early as January 2018 that the value of the Hotel, valued based on the Hotel's performance, was less than approximately $132 million.  The Company likewise was fully aware of the borrowers' inability to make interest payments, as well as the continued use of the Hotel as a homeless shelter.

88.    On March 7, 2019, one market analyst commented that in "[c]omparing 4Q18 losses and impairments with prior company commentary suggests that management was overly optimistic about resolution of its impaired assets."[14]  With

---

[13]    https://therealdeal.com/2019/02/28/highgate-led-partnership-shopping-midtowns-huge-row-hotel-for-sale/?source=content_type%3Areact%7Cfirst_level_url%3Aarticle%7Csection%3Amain_content%7Cbutton%3Abody_link

[14]    https://konekoresearch.com/2019/03/07/colony-credit-management-should-get-it-right-in-2019-or-get-out/?source=content_type%3Areact%7Cfirst_level_url%3Aarticle%7Csection%3Amain_content%7Cbutton%3Abody_link.

respect to the Hotel loans, market analysts noted that it was "disappointing that CLNC took an additional 4Q charge after prior comments about the $258mm loan." [15] Nevertheless, relying on the Company's representations that it intended to sell the Hotel to recover most of the outstanding principal balances, market analysts believed that the Hotel loans were "a senior loan interest so substantial recovery is certain." [16]

### I.   As of May 8, 2019, the Company's Valuation of the Hotel Remained Unchanged

89.   On May 8, 2019, Defendant Traenkle held a teleconference with investors to discuss the Company's earnings results for the first quarter of 2019 ("1Q19"). During that teleconference, Defendant Traenkle stated

> [W]e remain focused on taking proactive steps with regard to restructuring of loans secured by a New York City Hotel.  This restructuring is a key part of our overall portfolio rationalization strategy, as these loans remain on non-accrual status and therefore are not currently contributing to core earnings.  While this process is ongoing, **we do not have further updates to report at this time**.  However, once this restructuring is completed and our capital begins generating revenue, we believe our core earnings will benefit significantly.

### J.   On August 8, 2019, the Company Took a Staggering $104.3 Million Loan Loss Provision on the Hotel Loans, More Than Half of the Company's Most Recent Valuation, Valuing the Hotel at $102 Million

90.   On August 8, 2019, the Company reported its earnings results as of June 30, 2019, for the second quarter of 2019 ("2Q19") in a Quarterly Report filed on SEC Form 10-Q (the "2Q19 10-Q").  Therein, the Company stated:

> During the three months ended June 30, 2019, the Company revised its estimated recovery and recorded an additional $104.3 million of provision for loan loss.  The additional provision is based on significant deterioration in the NY hospitality market and feedback from the sales process and reflects the estimated value to be recovered from the borrower following a potential sale.

---

[15] *Id.*

[16] *Id.*

91.     During an August 8, 2019 teleconference to discuss the Company's 2Q19 earnings results, Defendant Redington stated:

> We initially impaired [the Hotel] in the third quarter last year, based on market pricing estimates provided to the borrower by its brokers.
>
> The borrower launched the sales process for the property earlier this year, which was adversely impacted by deteriorating hotel market conditions throughout New York City in the second quarter.  This resulted in lower bids from potential buyers than originally anticipated, and therefore during the second quarter, we impaired the asset to a revised estimated current value.

92.     That is, the only a few months after the Company assured investors that the risk of additional loan impairments was "very low," the Company recorded a loan loss provision of more than half of the most recent valuation of the Hotel loan collateral.

93.     The Company attempted to explain this dramatic devaluation as resulting from a significant deterioration of the hotel market and "feedback from the sales process." Both reasons were misleading.  *First*, no such significant deterioration in the New York City lodging and hospitality market had occurred.  To the contrary, the market was quite hospitable to hoteliers, buoyed by the duo of "[s]tronger economic indicators in Q2, coupled with accelerating group demand,"[17] according to a report published by PwC Hospitality Directions US on August 28, 2018.  According to that report, "fundamentals remained positive, as consumer confidence continued"[18] during 2Q19.  Additionally, "Q2 results yielded strong demand for hotels, outpacing increases in supply, as well as the highest Q2 increase in ADR since 2016." [19]   Further,

---

[17]     PwC      Hospitality     Directions     US,     https://www.hotel-online.com/press_releases/release/pwc-hospitality-directions-u-s-report-updates-lodging-outlook-suggesting/ (Aug. 28, 2018).

[18] *Id.*

[19] *Id.*

AMENDED CLASS ACTION COMPLAINT:  Case No. 2:20-cv-08305-PSG-PVC

"[c]ontinued growth in demand led to a midyear year-to-date occupancy rate of 65.9 percent" across the New York hospitality sector."[20]

94.     *Second*, in stating that the Company was basing its valuation of the Hotel at approximately $102 million on "feedback from the sales process," and upon "lower bids from potential buyers,"  the Company suggested that it had received bids on the Hotel at, or at least somewhere near, $102 million.  In fact, as explained below, the Company had not received a bid or interest anywhere near that amount, as only three months later it lowered its valuation of the Hotel again by approximately $50 million, reflecting a total lack of interest from buyers in purchasing the Hotel for approximately $102 million.

### K.     On November 8, 2019, the Company Takes Another $50.0 Million Loss Provision on the Hotel Loans, Valuing the Hotel at $52 Million and Causing a Final Round of Losses to Investors

95.     On November 8, 2019, the Company reported its earnings results as of September 30, 2019, for the third quarter of 2019 ("3Q19") in a Quarterly Report filed on SEC Form 10-Q (the "3Q19 10-Q").  Therein, the Company stated:

> During the three and nine months ended September 30, 2019, we recorded an additional provision for loan loss of $50.0 million and $154.3 million, respectively, based on **significant deterioration in the NY hospitality market**, **feedback from the sales process** and the estimated value to be recovered from the borrower following a potential sale.

96.     With the additional of this final loan loss provision during the Class Period for the loans collateralized by the Hotel, the Company recorded a staggering total of approximately $200 million of loan loss provisions for these loans during the Class Period.

97.     Moreover, the Company's statement that the Company's devaluation of the Hotel and corresponding loan loss provision were based on deterioration in the NY hospitality market was again inaccurate.   According to a January 21, 2020 New York

---

[20] *Id.*

Real Estate Journal article, throughout all of 2019,"New York [was] the highest in the country when it comes to occupancy levels, averaging 85% for 2019."[21]  According to that article, the Average Daily Rate ("ADR") for a room in Manhattan was $275 per night.  The Company's disclosures of a string of loan loss provisions amounted to a series of disclosures that the Company knowingly or with severe recklessness had overvalued the Hotel by over 400%.

### L.   The Company's Repeated Overvaluing of the Row Hotel NYC Was Material to Investors

98.   On August 8, 2019, the Company published a "Supplemental Financial Report Second Quarter 2019," in which it recorded an $0.84 net loss per share, attributable in substantial part to the $104.3 million loan loss provision across the four Hotel loans.   One market analyst explained that the Company's $104.3 million impairment at the end of 2Q19 affected the financial valuation of the Company by "about $1/share."[22]

99.   Just as importantly, investors wanted to know at all relevant times that the Company had misvalued collateral on some of the Company's largest loans by five times their true value, not only because such an overvaluation affected the formal valuation of the Company, but also because the overvaluation demonstrated that the Company either had knowingly misrepresented the true value of the four Hotel loans, or had been so severely reckless in its valuation of the four Hotel loans.

100.   As one investor noted, the Company's decision to take "another large write-down" on the Hotel loans after taking impairments in 3Q18 and 4Q18 "undermined any remaining basis for investor confidence in [Defendant] Traenkle" or in the Company.[23] Indeed, "the subsequent drop in CLNC shares" also suggested to market

---

[21] https://nyrej.com/hospitality-state-of-new-york-city-hotel-market-by-anudeep-gosal

[22] Seeking Alpha, *Colony Credit: Management Failed So The Company Should Be Sold* (Aug. 20, 2019).

23 Seeking Alpha, *Colony Credit: Management Failed So The Company Should Be Sold* (Aug. 20, 2019).

analysts "that investors ha[d] given up on the [C]ompany" and its leadership.[24]  At all relevant times, investors cared whether Company management act fraudulently or with severe recklessness in managing key assets.

101.   Indeed, as alleged in more detail below, the Company's share price dropped significantly upon the revelation of each loss provision related to the four Hotel loans.

## V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.   Defendants' Materially False and Misleading Statements and Omissions in 2018

#### 1.   December 7, 2017 & February 1, 2018:  Registration Statement

102.   On December 5, 2017, the Company filed its final amendment to the Registration Statement with the SEC on Form S-4/A (the "Form S-4/A"), which forms part of the Registration Statement.   On December 6, 2017, the Company filed a prospectus (the "Prospectus") pursuant to SEC Rule 424(b)(3), 17 C.F.R. § 230.424(b)(3).  The Form S-4/A and the Prospectus were declared effective by the SEC on December 6, 2017.   On January 31, 2018, the Company filed a Post-Effective Amendment No. 1 to Form S-4 Registration Statement (the "Amendment"), which forms part of the Registration Statement.  The Amendment was declared effective by the SEC on February 1, 2018.

103.   In the Registration Statement and Prospectus, Defendants omitted known trends about the performance of the Hotel that directly impacted its valuation and significantly increased the risk that the Company would have to take substantial loss impairments on the loans the Hotel collateralized.  In particular, the Defendants omitted to state that at the beginning of 2018, the Hotel had a projected annual NOI that, even with a 70% improvement, would result in a fair valuation of the Hotel that would require the Company to record material provisions for loan losses.

---

[24] Seeking Alpha, *Colony Credit: Management Failed So The Company Should Be Sold* (Aug. 20, 2019).

104.   In the Registration Statement and Prospectus, the Company stated:

It was determined that the current yields for NorthStar I's and NorthStar II's loans receivable approximated current market yields, and therefore fair value for the loans receivable was deemed to equal each loan's outstanding principal amount, plus the undiscounted value of any contractual exit fees associated with the loan.

105.   The statements in ¶ 104 were materially false and/or misleading because the fair value of the Hotel was materially less than $260 million (i.e., the outstanding principal amount on the loans collateralized buy the Hotel), so the fair value for the loans receivable was not equal to the outstanding principal mount of those loans.

106.   In the Registration Statement and Prospectus, the Company also stated:

| | Nine Months Ended September 30, | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| (In thousands, except per share data) | 2017 | 2016 | 2016 | 2015 | 2014 | 2013 | 2012 |
| **Statements of Operations Data:** | | | | | | | |
| Interest income(1) | $ 63,303 | $ 59,006 | $ 77,657 | $ 96,471 | $102,697 | $77,553 | $24,601 |
| Rental and other income | 66,827 | 58,330 | 78,602 | 60,394 | 29,342 | 1,970 | — |
| Total revenues | 130,130 | 117,336 | 156,259 | 156,865 | 132,039 | 79,523 | 24,601 |
| Interest expense—loans receivable(2) | 23,246 | 13,150 | 16,674 | 21,339 | 21,100 | 15,179 | 3,299 |
| Interest expense—real estate(2) | 14,160 | 12,895 | 17,519 | 14,832 | 7,763 | 583 | — |
| Property operating expense | 30,294 | 27,478 | 36,950 | 31,135 | 15,433 | 823 | — |
| Net income | 10,819 | 24,168 | 32,207 | 45,591 | 88,953 | 61,017 | 15,304 |
| Net income attributable to stockholders | 10,739 | 24,079 | 31,952 | 45,614 | 89,124 | 61,271 | 15,304 |
| **Share Data:** | | | | | | | |
| Earnings per share: | | | | | | | |
| Basic | $ 0.09 | $ 0.20 | $ 0.26 | $ 0.38 | $ 0.77 | $ 0.63 | $ 0.44 |
| Diluted | $ 0.09 | $ 0.20 | $ 0.26 | $ 0.38 | $ 0.77 | $ 0.63 | $ 0.44 |

| | September 30, | December 31, | | | | |
|---|---|---|---|---|---|---|
| (In thousands) | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 |
| **Balance Sheet Data:** | | | | | | |
| Total assets | $ 2,444,660 | $ 1,768,480 | $ 1,947,516 | $ 2,188,021 | $ 1,831,104 | $ 859,938 |
| Total debt(3) | 604,039 | 705,589 | 819,716 | 996,178 | 637,752 | 250,812 |
| Total liabilities | 1,542,321 | 799,355 | 915,505 | 1,125,324 | 825,879 | 342,192 |
| Total stockholders' equity | 885,029 | 950,087 | 1,014,324 | 1,043,340 | 1,000,651 | 517,742 |
| Total equity | 902,339 | 969,125 | 1,032,011 | 1,062,697 | 1,005,225 | 517,746 |

107.   The statements in ¶ 106 were materially false and/or misleading because the fair value of the Hotel was materially less than $260 million, and the Company's valuation of the loans collateralized by the Hotel were materially overstated, so the Company's valuation of its total assets was likewise overstated.

### 2.     May 15, 2018: 1Q18 10-Q

108.   On May 15, 2018, the Company filed a Quarterly Report on SEC Form 10-Q (the "1Q18 10-Q") for the first quarter of 2018 ("1Q18"), ending on March 31, 2018.  In the 1Q18 10-Q, the Company stated:

> In March 2018, the borrower on the Company's **$260.2 million NY hospitality loan failed to make its interest payment.**  The Company has placed the loan on non-accrual status and has commenced discussions with the borrower to resolve the matter.  **No provision for loan loss was recorded during the three months ended March 31, 2018 as the Company believes sufficient collateral value exists to cover the outstanding loan balances**.

109.   The statements in ¶ 108 were materially false and/or misleading because: (i) the fair value of the Hotel was materially less than $260 million, so the value of the collateral was insufficient to cover the outstanding balances on those loans (ii) Defendants knew that the value of the collateral was insufficient to cover the outstanding balances on those loans; and (iii) Defendants had access to information contradicting any belief, and otherwise lacked a reasonable basis to believe, that the collateral was sufficient to cover the outstanding balances on those loans.

110.   Also in the 1Q18 10-Q, the Company stated:

> Loans are considered to be impaired when it is probable that the Company will not be able to collect all amounts due in accordance with contractual terms of the loans, including consideration of underlying collateral value.  Allowance for loan losses represents the estimated probable credit losses inherent in loans held for investment at balance sheet date.

111.   The statements in ¶ 110 were materially false and/or misleading because, read in tandem with the statements in ¶ 108, they imply that the Company expected to recover the amounts due on the four Hotel loans, when in fact the Company knew that (i) the assets securing the four Hotel loans were not worth $260.2 million, but instead were worth no more than $132 million, (ii) the collateral value of the assets securing the four Hotel loans was insufficient to cover the outstanding balances on those loans, and

(iii) the borrower on the four Hotel loans had failed to make principal payments since April 2013.

### 3.   August 9, 2018:  2Q18 10-Q

112.   On August 9, 2018, the Company filed a Quarterly Report on SEC Form 10-Q (the "2Q18 10-Q") for the second quarter of 2018 ("2Q18"), ending on June 30, 2018.  In the 2Q18 10-Q, the Company stated

> In March 2018, the borrower on the Company's four NY hospitality loans with an unpaid principal balance of $260.2 million failed to make its interest payment.  **The Company has placed the loans on non-accrual status** and has commenced discussions with the borrower to resolve the matter.  Interest income is recognized on a cash basis.  **No provision for loan loss was recorded during the three and six months ended June 30, 2018 as the Company believes sufficient collateral value exists to cover the outstanding loan balances**.  During the three months ended June 30, 2018, the Company received and recognized $1.0 million in interest income on the loans.

113.   The statements in ¶ 112 were materially false and/or misleading because: (i) the fair value of the Hotel was materially less than $260 million, so the value of the collateral was insufficient to cover the outstanding balances on those loans (ii) Defendants knew that the value of the collateral was insufficient to cover the outstanding balances on those loans; and (iii) Defendants had access to information contradicting any belief, and otherwise lacked a reasonable basis to believe, that the collateral was sufficient to cover the outstanding balances on those loans.

114.   Also in the 2Q18 10-Q, the Company stated

> Loans and preferred equity investments are considered to be impaired when it is probable that the Company will not be able to collect all amounts due in accordance with contractual terms of the loans and preferred equity investments, including consideration of underlying collateral value. Allowance for loan losses represents the estimated probable credit losses inherent in loans held for investment at balance sheet date.

115.   The statements in ¶ 114 were materially false and/or misleading because, read in tandem with the statements in ¶ 112, they imply that the Company expected to recover the amounts due on the four Hotel loans, when in fact the Company knew that (i) the assets securing the four Hotel loans were not worth $260.2 million, but were instead worth materially less, (ii) the collateral value of the assets securing the four Hotel loans was insufficient to cover the outstanding balances on those loans, and (iii) the borrower on the four Hotel loans had failed to make principal payments since April 2013.

116.   Also in the 2Q18 10-Q, the Company stated

At June 30, 2018, 90 days or more past due loans includes four loans to the same borrower with combined carrying value of $261.1 million on non-accrual status.  All other loans . . . remain current on interest payments.

117.   The statements in ¶ 116 were materially false and/or misleading because (i) the Company valued the assets securing the four Hotel loans at $261.1 million, when the assets were worth materially less and (ii) the collateral value of the assets securing the four Hotel loans was insufficient to cover the outstanding balances on those loans.

### 4.   August 7, 2018: 2Q18 Earnings Call

118.   On August 7, 2018, Defendants Patel and Traenkle held a teleconference with investors to report the Company's 2Q18 earnings results (the "2Q18 Earnings Call").  On that call, Defendant Patel stated that "[the] $261 million unlevered first mortgage and mezzanine investment [is] secured by a New York City hotel."

119.   The statements in ¶ 118 were materially false and/or misleading because the Company valued the assets securing the four Hotel loans at $261 million, when the assets were worth no more than $132 million.

### 5.   November 9, 2018: 3Q18 10-Q

120.   On November 9, 2018, the Company filed a Quarterly Report on SEC Form 10-Q (the "3Q18 10-Q") for the third quarter of 2018 ("2Q18"), ending on September 30, 2018.  In the 3Q18 10-Q, the Company stated that:

In March 2018, the borrower on our four NY hospitality loans with an unpaid principal balance failed to make its interest payments. **These four loans are secured by the same collateral**. We placed the loans on non-accrual status and commenced discussions with the borrower to resolve the matter.

[. . .]

During the third quarter of 2018, discussions with the borrower did not progress as anticipated which has led us to exploring additional options for resolution. We prepared a weighted average probability analysis of potential resolutions, which included a recapitalization and earlier than expected receipt and sale of collateral. Based on this analysis, we recorded a $35.1 million provision for loan loss on the four NY hospitality loans during the third quarter of 2018.

121.   The statements in ¶ 120 were materially false and/or misleading because (i) the Company valued the assets securing the four Hotel loans at $225.1 million, when the assets were worth no more than $132 million; (ii) the collateral value of the assets securing the four Hotel loans was insufficient to cover the outstanding balances on those loans; and (iii) the Company's $35.1 million loan loss provision was actually based on market pricing estimates received by the borrower from various real estate listing brokers.

122.   Also in the 3Q18 10-Q, the Company stated:

Loans and preferred equity investments are considered to be impaired when it is probable that the Company will not be able to collect all amounts due in accordance with contractual terms of the loans and preferred equity investments, including consideration of underlying collateral value. Allowance for loan losses represents the estimated probable credit losses inherent in loans held for investment at balance sheet date.

123.   The statements in ¶ 122 were materially false and/or misleading because, read in tandem with the statements in ¶ 120, they imply that the Company expected to recover the $225.1 million on the four Hotel loans, when in fact the Company knew that (i) the assets securing the four Hotel loans were not worth $225.1 million, but instead

were worth no more than $132 million; and (ii) the Company's $35.1 million loan loss provision was actually based on market pricing estimates received by the borrower from various real estate listing brokers.

124.   Also in the 3Q18 10-Q, the Company stated:

> At September 30, 2018, 90 days or more past due loans includes four loans to the same borrower with combined carrying value before allowance for loan losses of $261.1 million on non-accrual status.   All other loans . . . remain current on interest payments.

125.   The statements in ¶ 124 were materially false and/or misleading because (i) the Company valued the assets securing the four Hotel loans at $261.1 million before loan losses, when the assets were worth no more than $132 million, and (ii) the collateral value of the assets securing the four Hotel loans was insufficient to cover the outstanding balances on those loans.

126.   Additionally, the Company stated in the 3Q18 10-Q that:

> On a periodic basis, the Company analyzes the extent and effect of any credit migration from underwriting and the initial investment review associated with the performance of a loan and preferred equity investment and/or **value of its underlying collateral**, **financial and operating capability of the borrower** or sponsor, as well as amount and status of any senior loan, where applicable.  Specifically, **operating results of collateral properties** and any cash reserves **are analyzed and used to assess whether cash from operations are sufficient to cover debt service requirements currently and into the future**, **ability of the borrower** to refinance the loan or preferred equity investment, **liquidation value of collateral** properties, and financial wherewithal of any loan guarantors, as well as the **borrower's competency in managing and operating the collateral** properties.  **Such analysis is performed at least quarterly, or more often as needed when impairment indicators are present.**

127.   The statements in ¶ 126 were materially false and/or misleading because the Company failed to state that (i) the value of the collateral securing the four Hotel loans did not support a valuation of $225.1 million, (ii) the borrower on the four Hotel loans had failed to make principal payments since April 2013, (iii) the operations of the

Hotel were impaired beginning in 2017 because the assets were being used, in part, for social service programming and homeless sheltering purposes, and not for lodging or hospitality services, and would continue to be so used through at least 2023; and (iv) the Company did not seek or rely upon an independent appraisal of the collateral securing the four Hotel loans to substantiate a valuation of $225.1 million.   Instead, the Company's $35.1 million loan loss provision was actually based on market pricing estimates received by the borrower from various real estate listing brokers.

### 6.   November 6, 2018: 3Q18 Earnings Call

128.   On November 6, 2018, Defendants Patel and Traenkle held a teleconference with investors to report the Company's 3Q18 earnings results (the "3Q18 Earnings Call").   On that call, Defendant Patel stated that:

> [W]e are working through the restructuring of four loans secured by a New York City hotel, which is on nonaccrual status[.]

> \*   \*   \*

> As New York City hotel room additions are beginning to be absorbed, we continue to be optimistic on the New York City lodging market recovery looking ahead to 2019 and 2020.  **And the forecasted NOI for this particular hotel is up approximately 70% from its initial 2018 budget**.

129.   The statements in ¶ 128 were materially false and/or misleading because (i) oversupply issues did not impact the New York City lodging and hospitality industry adversely during 1Q18, 2Q18, or 3Q18; and (ii) the Company failed to disclose that the operations of the Hotel were impaired beginning in 2017 because the assets were being used, in part, for social service programming and homeless sheltering purposes, and not for lodging or hospitality services, and would continue to be so used through at least 2023.

**B.      Defendants' Materially False and Misleading Statements in 2019**

**1.      March 1, 2019: 2018 10-K**

130.   On March 1, 2019, the Company filed an Annual Report on SEC Form 10-K (the "2018 10-K") in which it reported its earnings results for fiscal year 2018 and for the fourth quarter of 2018 ("4Q18"), ending on December 31, 2018.

131.   In the 2018 10-K, Defendants omitted known trends about the performance of the Hotel that directly impacted its valuation and significantly increased the risk that the Company would have to take substantial loss impairments on the loans the Hotel collateralized.  In particular, the Defendants omitted to state that as of March 1, 2019, the Hotel had a value of less than $132 million based on its 2018 operating income.

132.   In the 2018 10-K, the Company stated that:

In March 2018, the borrower on our four NY hospitality loans failed to make all required interest payments.  These four loans are secured by the same collateral.   We placed the loans on non-accrual status and commenced discussions with the borrower to resolve the matter.  Interest income was recognized on a cash basis.  During the year, we recognized $3.4 million in interest income on the loans.

During the third quarter of 2018, discussions with the borrower did not progress as anticipated which led us to exploring additional options for resolution.    We prepared a weighted average probability analysis of potential resolutions, which included a recapitalization and earlier than expected receipt and sale of collateral.  Based on this analysis, we recorded a $35.1 million provision for loan loss on the four NY hospitality loans during the third quarter of 2018.

**During the fourth quarter of 2018, the borrower entered into a listing agreement with a real estate brokerage firm and as a result, we believe sale of the underlying collateral and repayment of the four loans from the sales proceeds is the most likely outcome.  As such, we recorded an additional $18.8 million of provision for loan loss on the four NY hospitality loans in 2018 to reflect the estimated proceeds to be received from the borrower following the sale.**

133.   The statements in ¶ 132 were materially false and/or misleading because (i) the Company valued the assets securing the four Hotel loans at $206.3 million, when the

assets were worth no more than $132 million; (ii) the collateral value of the assets securing the four Hotel loans was insufficient to cover the outstanding balances on those loans; (iii) the Company's $18.8 million loan loss provision in 4Q18 was actually based on market pricing estimates received by the borrower from real estate brokers rather than an independent appraisal.

134.   Also in the 2018 10-K, the Company stated:

Loans and preferred equity investments are considered to be impaired when it is probable that the Company will not be able to collect all amounts due in accordance with contractual terms of the loans and preferred equity investments, including consideration of underlying collateral value. Allowance for loan losses represents the estimated probable credit losses inherent in loans and preferred equity held for investment at balance sheet date.

135.   The statements in ¶ 134 were materially false and/or misleading because, read in tandem with the statements in ¶ 132, they imply that the Company expected to recover at least $206.3 million on the four Hotel loans, when in fact the Company knew that the assets securing the four Hotel loans were not worth $206.3 million, but instead were worth materially less.

136.   Also in the 2018 10-K, the Company stated:

At December 31, 2018, 90 days or more past due loans includes four loans to the same borrower and secured by the same collateral with combined carrying value before allowance for loan losses of $258.1 million on non-accrual status.   All other loans . . . remain current on interest payments.

*   *   *

At December 31, 2018, 90 days or more past due loans includes four loans to the same borrower and secured by the same collateral with a combined carrying value before allowance for loan losses of $137.1 million.   The Company foreclosed on these four loans in January 2019.   All other loans . . . remain current on interest payments.

137.   The statements in ¶ 136 were materially false and/or misleading because (i) the Company valued the assets securing the four Hotel loans at $258.1 million before loan losses, when the assets were worth no more than $132 million and (ii) the collateral value of the assets securing the four Hotel loans was insufficient to cover the outstanding balances on those loans.

138.   On February 28, 2019, Defendants Redington and Traenkle held a teleconference with investors to report the Company's 4Q18 earnings results (the "4Q18 Earnings Call").   During the 4Q18 Earnings Call, in response to a market analyst's questions concerning the Hotel, Defendant Traenkle stated

> [The Hotel's] earnings are a little bit lumpy, . . . [s]o, we thought it was in the best interest just to kind of clean up some of the noise around the quarter-to-quarter kind of market-to-markets that we're seeing is just to sell the portfolio [*sic*].  And, in fact, [the Hotel] **is for sale right now**.  **We have a lot of interest**.  There's a number of parties that have been in the data room.  And yeah, we think **it's going to trade at a number that will be acceptable to us**.  And I think it's going to be able to kind of repatriate a lot of capital that we'll be able to redeploy into much higher yielding assets.  And we'll put this behind us and we'll be much better off for it.

> [. . .]

> Yeah.  So, **the risks are very low**.

139.   The statements in ¶ 138 were materially false and/or misleading because (i) they implied that Defendants had a reasonable basis to believe that the Hotel would trade at or around $206 million, when in fact Defendants lacked any such reasonable basis; (ii) they suggested that buyers had made bids for the Hotel at or around $206 million when they had not; (iii) they misstated the risk that additional impairments could occur, as the Company recorded an additional loan loss provision of over $100 million less than three months later.

### 2.   August 8, 2019: 2Q19 10-Q

140.   On August 8, 2019, the Company filed a Quarterly Report on SEC Form 10-Q (the "2Q19 10-Q") in which it reported its earnings results for the second quarter

of 2019 ("2Q19"), ending on June 30, 2019.  In the 2Q19 10-Q, the Company stated that:

> In March 2018, the borrower on our four NY hospitality loans failed to make all required interest payments.  These four loans are secured by the same collateral.  The Company believes ultimate sale of the underlying collateral and repayment of the loans from the sales proceeds is the most likely outcome.  During 2018, the Company recorded $53.8 million of provision for loan losses on the four NY hospitality loans to reflect the estimated value to be recovered from the borrower following a sale. **During the three months ended June 30, 2019, the Company revised its estimated recovery and recorded an additional $104.3 million of provision for loan loss.  The additional provision is based on significant deterioration in the NY hospitality market and feedback from the sales process and reflects the estimated value to be recovered from the borrower following a potential sale**.

141.   The statements in ¶ 140 were materially false and/or misleading because (i) the Company valued the assets securing the four Hotel loans at $102 million, when the assets were worth materially less than $102 million; and (ii) the New York hospitality market did not deteriorate in 1Q19 or in 2Q19.

142.   Also in the 2Q19 10-Q, the Company stated:

> Loans and preferred equity investments are considered to be impaired when it is probable that the Company will not be able to collect all amounts due in accordance with contractual terms of the loans and preferred equity investments, including consideration of underlying collateral value. Allowance for loan losses represents the estimated probable credit losses inherent in loans and preferred equity held for investment at balance sheet date.

143.   The statements in ¶ 142 were materially false and/or misleading because, read in tandem with the statements in ¶ 140, they imply that the Company expected to recover at least $102 million on the four Hotel loans, when the Company knew that the assets securing the four Hotel loans were worth materially less than $102 million.

144.   Also in the 2Q19 10-Q, the Company stated:

> At June 30, 2019, 90 days or more past due loans includes four loans to the same borrower and secured by the same collateral with combined carrying values before allowance for loan losses of $258.1 million on non-accrual status.  All other loans . . . remain current on interest payments.

145.   The statements in ¶ 144 were materially false and/or misleading because (i) the Company valued the assets securing the four Hotel loans at $102 million before loan losses, when the assets were worth materially less than $102 million and (ii) the collateral value of the assets securing the four Hotel loans was insufficient to cover the outstanding balances on those loans.

### 3.   August 8, 2019: 2Q19 Earnings Call

146.   On August 8, 2019, Defendants Redington and Traenkle held a teleconference with investors to report the Company's 2Q19 earnings results (the "2Q19 Earnings Call").  On that call, with specific respect to the four Hotel loans, Defendant Redington stated that:

> We initially impaired [the Hotel] in the third quarter last year, based on market pricing estimates provided to the borrower by its brokers.
>
> The **borrower launched the sales process for the property earlier this year, which was adversely impacted by deteriorating hotel market conditions throughout New York City in the second quarter**.  This resulted in lower bids from potential buyers than originally anticipated, and therefore during the second quarter, we impaired the asset to a revised estimated current value.  **The borrower is monitoring market conditions** and we will share our progress with you in the near future.

147.   The statements in ¶ 146 were materially false and/or misleading because the New York City hotel market was among the strongest in the country in 2Q19.

148.   In direct response to an investor's question concerning the basis of the Company's representation that the New York City hotel market conditions deteriorated in 2Q19, Defendant Redington stated that:

> There are a number of different factors impacting the New York market.  I think **most of it we see is actually foreign tourism being down that has**

**adversely impacted the entire New York market and in particular this property** that there are some other factors like you mentioned that the apartment aspect but **we're really seeing it probably most related to the overall inbound market from Europe and from the UK.**

149.   The statements in ¶ 148 were materially false and/or misleading because the New York City hotel market was among the strongest in the country in 2Q19.

## VI.   LOSS CAUSATION

### 1.   November 6, 2018

150.   On November 6, 2018, Colony Credit held a teleconference with investors during which it discussed its quarterly results for the third quarter of 2018.  During that teleconference, Colony Credit reported loan loss provisions totally $35.1 million on the four Hotel loans.

151.   On this news, the price of Colony Credit's shares fell by $1.02 per share, to close at $16.97 per share on November 6, 2018.

### 2.   March 1, 2019

152.   On March 1, 2019, Colony Credit filed its annual report for 2018, in which it noted an additional $18.8 million provision for loan losses on the Hotel loans during the fourth quarter of 2018.

153.   On this news, the price of Colony Credit's shares fell by $0.94 per share, to close at $16.49 per share on March 1, 2019.

### 3.   August 9-12, 2019

154.   On August 9, 2019, Colony Credit reported its quarterly results for the second quarter of 2019, in which it reported a $104.3 million provision for loan losses on the Hotel loans.

155.   On this news, the price of Colony Credit's shares fell by $2.00 per share, or more than 12%, over two consecutive trading sessions, to close at $14.05 per share on August 12, 2019.

#### 4.        November 8-11, 2019

156.   On November 8, 2019, Colony Credit announced that during the third quarter of 2019, the Company recorded a $50.0 million provision for loan loss related to the four Hotel loans "based on significant deterioration in the NY hospitality market, feedback from the sales process and the estimated value to be recovered from the borrower following a potential sale."

157.   On this news, the price of Colony Credit's shares fell by $2.99 per share over two consecutive trading days, or nearly 21%, to close at $11.75 per share on November 8, 2019 and $11.29 per share on November 11, 2019.

### VII.    ADDITIONAL SCIENTER ALLEGATIONS

#### A.    Defendant Traenkle Told Investors that He Investigated the Company's Portfolio Thoroughly

158.   On February 28, 2019, during an earnings teleconference with investors, an investor asked Defendant Traenkle whether the Company foresaw any further write-downs on the four Hotel loans.  Defendant Traenkle replied, "[T]he risks are very low.  We've gone through the portfolio extensively kind of asset by asset, loan by loan." By these statements, Defendant Traenkle admitted that he had investigated "extensively" the Company's valuation of the Hotel, so that he knew or was severely reckless in disregarding the fact that the Hotel was severely overvalued.

#### B.    The Company Knew Of The Existence Of The DHS Safe Haven Social Services Site At The Hotel Since Before The Merger, But Never Disclosed Its Existence Or Effect On The Company's Expected NOI.

159.   As explained in ¶¶ 43–51, Defendants knew that the Hotel's NOI did not justify a valuation of $260 million as of February 1, 2018 because the arrival of the DHS Safe Haven social services site at the Hotel resulted in an immediate drop in NOI from rents that would last through at least 2023.

#### C.    Defendant Patel Resigned On The Same Date that the Company Recorded the First Impairment

160.   On November 9, 2018, the Company announced Defendant Patel's immediate resignation "from all positions he held with [the Company] and its

subsidiaries, including Mr. Patel's position as Chief Financial Officer and Treasurer of the Company, in order to pursue other opportunities."[25]

## VIII.   CLASS ACTION ALLEGATIONS

161.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Colony Credit securities in the United States during the Class Period and who were damaged upon the revelation of the alleged corrective disclosures (the "Class").

162.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Colony Credit securities were actively traded on the New York Stock Exchange.  While the exact number of Class Members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Colony Credit, its transfer agent, or its domestic depositary, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

163.   Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

164.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

---

[25] Colony Credit Real Estate, Inc., SEC Form 8-K (Nov. 9, 2018).

165.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether applicable securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Colony Credit;

(c)   whether the Individual Defendants caused Colony Credit to issue false and misleading statements during the Class Period;

(d)   whether Defendants acted knowingly or recklessly in issuing false and misleading statements; and

(e)   whether the members of the Class have sustained damages and, if so, what the proper measure of damages is.

166.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

167.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine.

168.   The markets for Colony Credit's securities were open, well-developed, and efficient at all relevant times.   As a result of the materially false and/or misleading statements and/or failures to disclose, Colony Credit's securities traded at artificially inflated prices during the Class Period.   On September 21, 2018 the Company's securities on the New York Stock Exchange closed at a Class Period high of $23.00. Plaintiffs and other members of the Class purchased or otherwise acquired the

Company's securities relying upon the integrity of the market price of Colony Credit's securities and market information relating to Colony Credit and have been damaged thereby.

169. During the Class Period, the artificial inflation of Colony Credit's securities was caused by the material misrepresentations and/or omissions particularized in this Amended Complaint, causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Colony Credit's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Colony Credit and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated and maintained at artificially inflated levels at all relevant times, and when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements during the Class Period induced and resulted in purchases, by Plaintiffs and members of the Class, of the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

170. At all relevant times, the markets for Colony Credit's securities were efficient markets for the following reasons, among others:

(a)    Colony Credit's securities met the requirements for listing, and were listed and actively traded, on the New York Stock Exchange, a highly efficient and automated market;

(b)    As a regulated issuer, Colony Credit filed periodic public reports with the SEC and/or the New York Stock Exchange;

(c)    Colony Credit regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and

through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

    (d) Colony Credit was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales forces and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

   171. As a result of the foregoing, the market for Colony Credit's securities promptly digested current information regarding Colony Credit from all publicly available sources and reflected such information in the price of Colony Credit's securities. Under these circumstances, all purchasers of Colony Credit's securities during the Class Period suffered similar injury through their purchase of Colony Credit's securities at artificially inflated prices, and a presumption of reliance applies.

   172. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims center, in large part, upon Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated by law to disclose—positive proof of reliance is not a prerequisite to recovery.

## IX. NO SAFE HARBOR

   173. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Amended Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. Additionally, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified specifically as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

AMENDED CLASS ACTION COMPLAINT:  Case No. 2:20-cv-08305-PSG-PVC

174.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those forward-looking statements because at the time each such statement was made, the speaker had actual knowledge, or recklessly disregarded the risk, that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Colony Credit who knew, or recklessly disregarded the risk, that the statement was false when made.

## X.   COUNT ONE

### For Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5 (Against All Defendants)

175.   Plaintiffs repeat, reallege, and incorporate by reference each and every allegation heretofore pleaded as if fully set forth herein.

176.   Throughout the Class Period, Colony Credit's securities were listed on the New York Stock Exchange.

177.   During the Class Period, Defendants made, disseminated, or approved the false and misleading statements specified above.   The Defendants knew that such statements, when made, were false and misleading, or were reckless in their disregard as to the truth of such statements, which contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

178.  The Defendants violated Section 10(b) of the Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78j(b) and SEC Rule 10b–5, *codified as amended*, 17 C.F.R. § 240.10b–5, because, in utilizing the means or instrumentalities of interstate commerce, including but not limited to the mails and the Internet, and/or the facilities of the New York Stock Exchange, they directly or indirectly:

(a)     employed devices, schemes or artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)    engaged in acts, practices, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and the members of the Class in connection with their purchases of Colony Credit securities during the Class Period.

179.   Plaintiffs and members of the Class have suffered damages in that, in reliance on the Defendants' statements and the integrity of the market, they paid artificially inflated prices for Colony Credit's securities.  Plaintiffs and members of the Class would not have purchased such securities at the prices they paid, or at all, if they had been aware that the market prices of Colony Credit's securities had been artificially and falsely inflated by the Defendants' false and misleading statements.

180.   As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and members of the Class suffered damages in connection with their purchases of Colony Credit's securities on the New York Stock Exchange during the Class Period.

# XI.    COUNT TWO

### For Violations of Section 20(a) of the Securities Exchange Act of 1934
### (Against the Individual Defendants)

181.   Plaintiffs repeat, reallege, and incorporate by reference each and every allegation heretofore pleaded as if fully set forth herein.

182.   Throughout the Class Period, Colony Credit's securities were listed on the New York Stock Exchange.

183.   As alleged herein, the Individual Defendants acted as controlling persons of Colony Credit within the meaning of Section 20(a) of the Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78t(a).  By virtue of their high-level positions, ownership rights, contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

184.  In particular, each of these Individual Defendants had direct and supervisory involvement in the quotidian operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

185.  As set forth above, the Defendants each violated Section 10(b) of the Exchange Act of 1934 and SEC Rule 10b–5 by their acts and/or omissions as alleged in this Amended Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of said Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities traded on the New York Stock Exchange during the Class Period.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.   Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.   Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in investigating, bringing, and maintaining this action, including counsel fees and expert fees; and

D.      Awarding such other and further legal or equitable relief as the Court deems just and proper.

## XIII.     JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable in this Action.

Dated:  February 1, 2021

Respectfully submitted,

POMERANTZ LLP

*/s/ Jennifer Pafiti*
Jennifer Pafiti
1100 Glendon Avenue, 15th Floor
Los Angeles, California  90024
Telephone:  (310) 405-7190
Facsimile:  (917) 463-1044
Email:  jpafiti@pomlaw.com

Jeremy A. Lieberman (*pro hac vice application*
  *forthcoming*)
Austin P. Van (*pro hac vice application forthcoming*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
avan@pomlaw.com

*Lead Counsel for Lead Plaintiffs*

Peretz Bronstein
BRONSTEIN, GEWIRTZ &
    GROSSMAN, LLC
60 East 42nd Street, Suite 4600
New York, New York  10165
Telephone:  (212) 697-6484
Facsimile:  (212) 697-7296
Email:  peretz@bgandg.com

*Additional Counsel for Lead Plaintiffs*