POMERANTZ LLP
Jennifer Pafiti (SBN 282890)
Jeremy A. Lieberman (*pro hac vice application forthcoming*)
Austin P. Van (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York   10016
Telephone:   (212) 661-1100
Email:        jpafiti@pomlaw.com
              jalieberman@pomlaw.com
              avan@pomlaw.com

*Counsel for Lead Plaintiffs*

— additional counsel on signature page —

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRENCE PETERS, Individually and On Behalf of All Others Similarly Situated,<br><br>                              Plaintiffs,<br><br>    v.<br><br>COLONY CREDIT REAL ESTATE, INC., F/K/A COLONY NORTHSTAR CREDIT REAL ESTATE, INC., RICHARD B. SALTZMAN, KEVIN P. TAENKLE, SUJAN S. PATEL, NEALE W. REDINGTON, CATHERINE D. RICE, FRANK V. SARACINO, VERNON B. SCHWARTZ, DARREN J. TANGEN, JOHN E. WESTERFIELD, AND WINSTON W. WILSON,<br><br>                              Defendants. | Case No. 2:20-CV-08305-PSG-PVC<br><br>**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>Judge:      Hon. Philip S. Gutierrez<br>Courtroom:  6A<br>Hr'g Date:  June 7, 2021<br>Time:       1:30 p.m. |

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT CASE NO. 2:20 CV 08305 PSG PVC

# TABLE OF CONTENTS

I.#     PRELIMINARY STATEMENT ..................................................................1#

II.#    FACTUAL BACKGROUND........................................................................2#

    A.#    Colony Credit & its Pre-Merger Business .............................................2#

    B.#    Overvaluation of the Row Hotel in the Registration Statement ...........3#

    C.#    Impairments on the Row Hotel Loans after the Merger ......................5#

III.#   STANDARD ON MOTION TO DISMISS ...................................................7#

IV.#    ARGUMENT:  RELIANCE.......................................................................7#

    A.#    Plaintiffs Have Adequately Pleaded Reliance for Omissions in the Registration Statement under *Affiliated Ute* ..........................................8#

    B.#    Plaintiffs Have Adequately Pleaded Reliance for Statements After the Registration Statement ........................................................................9#

        1.#    The AC Adequately Pleads Reliance for Statements Made after the Registration Statement under *Basic* .......................................9#

        2.#    Plaintiffs Allege that Members of the Class Purchased Shares in Reliance on the Misrepresentations, and Plaintiffs Are Permitted to Represent Them....................................................10#

V.#     ARGUMENT:  MISSTATEMENTS OR OMISSIONS ..........................11#

    A.#    The Company Made Materially False Statements or Omissions About its Valuation .......................................................................................11#

        1.#    The Company Made Material Omissions about the Value of the Row Hotel in the Registration Statement .................................11#

        2.#    The Company Made Material Omissions about the Value of the Row Hotel in its Post-Merger SEC Filings...............................16#

        3.#    The Company's Misrepresentations and Omissions Concerning its Valuation of the Row Hotel Were Misleading Not Because *Plaintiffs* Valued the Hotel at Less, but Because *Defendants Themselves* Valued the Hotel at Less .....................................17#

B.# The Company's Statements about the Risk of Additional Impairments Were Materially Misleading.................................................................19#

**VI.# ARGUMENT: SCIENTER**.................................................................20#

**VII.# ARGUMENT: PLAINTIFFS HAVE PROPERLY PLEADED SECONDARY VIOLATIONS** .................................................................23#

**VIII.#CONCLUSION** .................................................................23#

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| **AC** | Amended Class Action Complaint for Violations of the Federal Securities Laws (Feb. 1, 2021) [Dkt. 37] |
| **Amended Complaint** | Amended Class Action Complaint for Violations of the Federal Securities Laws (Feb. 1, 2021) [Dkt. 37] |
| **Class** | (As defined at page 1 of the Amended Complaint) |
| **Class Period** | (As defined at page 1 of the Amended Complaint) |
| **Colony Credit** | Colony Credit Real Estate, Inc. f/k/a Colony Northstar Credit Real Estate, Inc. |
| **Company** | Colony Credit Real Estate, Inc. f/k/a Colony Northstar Credit Real Estate, Inc. |
| **Complaint** | Amended Class Action Complaint for Violations of the Federal Securities Laws (Feb. 1, 2021) [Dkt. 37] |
| **Defendants** | Colony Credit Real Estate, Inc. f/k/a Colony Northstar Credit Real Estate, Inc., Richard B. Saltzman, Kevin P. Traenkle, Sujan S. Patel, Neale W. Redington, Catherine D. Rice, Frank V. Saracino, Vernon B. Schwartz, Darren J. Tangen, John E. Westerfield, and Winston W. Wilson |
| **Defs.' Mem.** | Defendants' Memorandum of Points & Authorities in Support of Motion to Dismiss Amended Class Action Complaint for Violations of the Federal Securities Laws (Mar. 3, 2021) [Dkt. 45-1] |
| **Exchange Act** | Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. §§ 78a *et seq.* |
| **GAAP** | Generally Accepted Accounting Principles |
| **Hotel** | The Row NYC, as alleged in AC ¶¶ 43–44 |
| **Individual Defendants** | Richard B. Saltzman, Kevin P. Traenkle, Sujan S. Patel, Neale W. Redington, Catherine D. Rice, Frank V. Saracino, Vernon B. Schwartz, Darren J. Tangen, John E. Westerfield, and Winston W. Wilson |
| **Loans** | Four senior mortgage and mezzanine loans owned by Colony Credit collateralized by the Hotel, as alleged in AC ¶¶ 3–9 |
| **Motion** | Defendants' Motion to Dismiss Amended Class Action Complaint for Violations of the Federal Securities Laws (Mar. 3, 2021) [Dkt. 45] |

| NOI | net operating income |
|---|---|
| **Plaintiffs** | Philip Nuccetelli, Alan Cohen, Roger P. Martyna, Terrence Peters |
| **Registration Statement or RS** | As defined in ¶ 102 of the Amended Complaint |
| **SEC** | United States Securities & Exchange Commission |
| **Section 10(b)** | Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) |
| **Section 20(a)** | Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfus v. Pyramid Tech. Corp.*,
764 F. Supp. 598 (N.D. Cal. 1991)......................................................................10

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988)..............................................................................................2, 9

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ..................................................................................22

*Burr v. Equity Bancshares, Inc.*,
2020 WL 6063558 .................................................................................................18

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech, Inc.*,
65 F. Supp. 3d 840 (N.D. Cal. 2014), *aff'd*, 856 F.3d 605 (9th Cir. 2017)........15

*In re Apple Inc. Sec. Litig.*,
2020 WL 2857397 (N.D. Cal. June 2, 2020)........................................................17

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prods. Liab. Litig.*,
295 F. Supp. 3d 927 (N.D. Cal. 2018)...................................................................10

*In re Connetics Corp. Sec. Litig.*,
542 F. Supp. 2d 996 (N.D. Cal. 2008)...................................................................11

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..................................................................9

*In re Leapfrog Enter., Inc. Sec. Litig.*,
237 F. Supp. 3d 943 (N.D. Cal. 2017).............................................................20, 22

*In re LendingClub Sec. Litig.*,
254 F. Supp. 3d 1107 (N.D. Cal. 2017).................................................................20

*In re Lernout & Hauspie Sec. Litig.*,
208 F. Supp. 2d 74 (D. Mass. 2002)......................................................................22

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ...............................................................22

*In re Qwest Commc'ns Int'l, Inc.*,
    396 F. Supp. 2d 1178 (D. Colo. 2004)....................................................22

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
    266 F. Supp. 2d 1150 (C.D. Cal. 2003) ..................................................20

*In re Valley Health Sys.*,
    429 B.R. 692 (Bankr. C.D. Cal. 2010) ...................................................12

*In re Van Wagoner Funds, Inc. Sec. Litig.*,
    382 F. Supp. 2d 1173 (N.D. Cal. 2004).....................................................7

*In re Verisign, Inc.*,
    No. C 02-02270, 2005 WL 88969 (N.D. Cal. Jan. 13, 2005)...............10, 11

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) ...................................................................16

*In re Volkswagen 'Clean Diesel' Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    328 F. Supp. 3d 963 (N.D. Cal. 2018)......................................................8

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) ..............................................18, 19

*Karinski v. Stamps.com, Inc.*,
    472 F. Supp. 3d 747 (C.D. Cal. 2020) ....................................................18

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*, 139 S. Ct.
    2615 (2019)...........................................................................................15

*N.M. State Inv. Council v. Ernst & Young LLP*,
    641 F.3d 1089 (9th Cir. 2011) ..................................................................7

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir.), *cert. denied*, 540 U.S. 966 (2003) .....................22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)...............................................................................19

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*,
  142 F. Supp. 2d 589 (D.N.J. 2001) ..................................................................22

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
  2020 WL 2559939 (N.D. Cal. May 20, 2020)..............................................18, 19

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ..........................................................................22

*Warshaw v. Xoma Corp.*,
  74 F.3d 955 (9th Cir. 1996) ............................................................................16

*Welgus v. TriNet Grp., Inc.*,
  2017 WL 6466264 (N.D. Cal. Dec. 18, 2017)............................................10, 11

## **Statutes**

Exchange Act Section 10(b) ...........................................................................*passim*

PSLRA ..........................................................................................................22

## **Rules**

Rule 10b–5 ...........................................................................................................8

Rule 12(b)(6)........................................................................................................7

## I.    PRELIMINARY STATEMENT

Colony Credit was created through a merger of three affiliated entities on January 31, 2018 (the "Merger"). In the Registration Statement issued in connection with this combination, Colony Credit implied that the value of the hotel (the "Hotel") collateralizing its largest loans (the "Loans") was approximately $260 million. In fact, the Company had valued the Hotel in January 2018, in its quarterly valuations of loan collateral, at approximately $132 million. Plaintiffs know this because months later, Defendant Patel himself told investors that the Hotel conducted an annual income forecast in January 2018, and his statement mathematically implied that the Hotel was valued at $132 million under the method of valuing real estate the Company used to value its real estate assets, the direct capitalization approach. In its subsequent quarterly and annual reports during the Class Period, the Company continued to imply that the value of the Hotel was $260 million, even though the Company knew very well that its value was $132 million, and later even less, under the Company's own preferred valuation methodology. After 15 months, the Company acknowledged a valuation of the Hotel that was half what it had previously disclosed, and after 18 months, that valuation sank by four fifths. As the market learned the true value of the Hotel over a series of disclosures in which the Company took staggering loan impairments, the Company's share price declined by over one third.

This conduct constitutes a violation of Section 10(b) of the Exchange Act. Colony Credit made statements in the Registration Statement implying that the value of the Hotel was sufficient to cover the value of the Loans, yet omitted from these statements that under the Company's own valuation methodology, the Hotel's value was woefully insufficient. Subsequently, Colony Credit repeatedly made affirmative statements about the value of the Hotel, yet these statements blatantly misled investors about the Company's own valuation of that collateral.

Defendants argue that the AC fails to state a claim. Defendants are mistaken. *First*, Defendants argue that the AC fails to plead facts that satisfy the reliance requirement of Section 10(b). Yet Plaintiffs may rely on the presumption of reliance under *Affiliated Ute* for statements made in the Registration Statement because those statements are misleading by omission. Likewise, Plaintiffs seek to represent a class that includes investors who acquired their securities after the Registration Statement, and those investors are entitled to the presumption of reliance under *Basic* because the AC alleges that Colony Credit shares traded in an efficient market.

*Second*, Defendants argue that the AC fails to allege false and misleading statements; according to Defendants, the AC merely attempts to substitute Plaintiffs' valuation judgments for Defendants', and fails to allege that Defendants valued the Hotel in a way that does not fairly align with their public statements about that valuation. Not so. Plaintiffs allege, not that Defendants' valuation was severely off under a methodology proposed by Plaintiffs, but rather that it was severely off under the very methodology Defendants told investors was "appropriate" for valuing assets like the Hotel—the very methodology Defendants actually used to value it. In short, the AC alleges exactly the facts that Courts found missing in the primary cases on which Defendants rely.

*Finally*, Defendants argue halfheartedly at the end of their memorandum that the AC fails to allege scienter. In fact, the AC contains multiple quotes that make pellucid that Defendants were fully aware of the overvaluation of the Hotel during the Class Period.

Defendants' motion should be denied.

## II.   FACTUAL BACKGROUND

### A.   Colony Credit & its Pre-Merger Business

Colony Credit is a commercial retail estate ("CRE") credit real estate investment trust ("REIT") that manages a portfolio of, among other things, CRE senior mortgage

and mezzanine loans secured by commercial properties, including three parcels of real property that collectively comprise the Row Hotel, an historic hotel in Times Square, New York (the "Hotel"). ¶¶ 2, 4, 19, 34, 43–46, 66. The Company has claimed to be "one of the largest publicly traded CRE credit/mortgage REITs." ¶ 2.

On January 31, 2018, Colony NorthStar Credit Real Estate, Inc. ("CNCRE"), the Company's predecessor-in-interest, together with certain other assets and liabilities controlled by its parent company, Colony NorthStar Inc. ("Colony NorthStar"), merged with NorthStar Real Estate Income Trust, Inc. ("NorthStar I") and NorthStar Real Estate Income II, Inc. ("NorthStar II") (the "Merger"), to form the Company. ¶¶ 4, 36. On June 25, 2018, the Company changed its name to Colony Credit Real Estate, Inc. ¶ 42. Prior to the Merger, NorthStar I, and NorthStar II held certain interests in four loans (the "Loans") secured by certain interests in the Hotel. ¶¶ 43–46 & n.4.

**B.      Overvaluation of the Row Hotel in the Registration Statement**

In the Registration Statement, the Company implied that the value of the Hotel was equal to the Loans' outstanding principal amount, which at the time was approximately $260 million, ¶ 56, but the Company failed to disclose that the Company's own valuation of the Hotel was materially less than $260 million. ¶ 103. In the Registration Statement, the Company stated that it determined the fair value of its own properties by applying either of two methodologies:

> The fair value of real estate and related intangibles ("CRE Properties") was determined using, in the case of NorthStar I, either a direct capitalization approach or a discounted cash flow ("DCF") methodology, depending on the asset type, and in the case of NorthStar II, a DCF methodology, which *we believe are appropriate for valuing assets similar to the properties owned by NorthStar I and NorthStar II*.

Decl. of Terrence W. Scudieri, Jr. (the "Scudieri Decl."), Ex. A at F-15. The NorthStar I and II properties included hotels. *Id.* at F-2-57 (NorthStar I); G-1-146 (NorthStar II).

The Company also stated that, in determining whether loan impairments were appropriate, it assessed the "credit quality of the portfolio and adequacy of loan loss reserves on a quarterly basis or more frequently as necessary." *Id.* at F-1-79 (NorthStar I assets), G-1-83 (NorthStar II assets). For both groups, the Company stated that "[i]f . . . the estimated fair value of the underlying collateral is less than the net carrying value of the loan, a loan loss reserve is recorded with a corresponding charge to provision for loan losses." *Id.*

Taken together, the impairment policies for the merging entities led investors to believe that the Company conducted quarterly assessments of loan impairment, and that the Company would record impairments if the fair value of the underlying collateral was less than the net carrying value of the loan. The Company told investors that an "appropriate methodology" for determining the fair value of hotels was a direct capitalization approach. Accordingly, the Registration Statement implied to investors that under the methodologies the Company itself believed to be appropriate in determining a fair valuation of the Hotel, including the direct capitalization approach, the value of the underlying collateral was not less than the net carrying value of the Loan.

In fact, under the direct capitalization approach, the value of collateral underlying the Loans, namely the Hotel, was less than the carrying value of those loans. The Company omitted to state that, under a methodology the Company told investors it believed to be "appropriate for valuing assets similar to [hotels owned by the Company]," the direct capitalization approach, the loan collateralized by the Hotel was impaired. ¶ 103. The Company likewise failed to disclose that under that approach, the Company knew in January 2018 that the fair value of the Hotel was less than $132 million, ¶ 71, substantially less than the $260 million valuation ascribed in the Registration Statement. ¶¶ 103–07.

**C.    Impairments on the Row Hotel Loans after the Merger**

In the Company's quarterly reports for the first and second quarters of 2018, the Company continued to tell investors that the Loans were secured by collateral valued at $260 million, even though the Company valued the Hotel at a figure far less than $132 million.  Each time the Company stated that although "the borrower on the Company's $260.2 million NY hospitality loan" (*i.e.*, the Loans) was behind on payments, the Company nevertheless "believes sufficient collateral value exists to cover the outstanding loan balances," so that "[n]o provision for loan loss was recorded." *Id.*  Yet as of May 18 and August 9, 2018, based on the Company's own valuation approach (*i.e.*, the direct capitalization approach), *see* Scudieri Decl., Ex. B at 29; *id.*, Ex. C at 31, the Company knew but did not disclose that the value of the Hotel was less than $132 million.  ¶¶ 64, 71.

The Company had informed investors in the Registration Statement that an appropriate methodology for valuing the Hotel included the direct capitalization method.  In the Company's May 18 and August 9, 2018 quarterly reports, the Company further suggested to investors that the direct capitalization method was the appropriate method for valuing real estate assets like the Hotel because that was the method the Company itself used to value its own real estate assets, including its interests in the Row Hotel.  *See* Scudieri Decl., Ex. B at 29; *id.*, Ex. C at 31.  The Company stated that it based the fair value of real estate and real estate intangibles "on the income approach which includes a direct capitalization method with overall capitalization rates ranging between 6.5% and 8.3%."  The Company reaffirmed this basis for its valuation of the Hotel in its subsequent SEC filings throughout the Class Period.  *See* Scudieri Decl., Ex. D at 32 (3Q18); *id.*, Ex. E at F-30 (4Q18); *id.*, Ex. F at 29 (1Q19); *id.*, Ex. G at 30 (2Q19); *id.*, Ex. H at 30 (3Q19).  Thus, at all times during the Class Period, the Company informed investors that it believed that the appropriate approach to valuing the Hotel asset was the direct capitalization approach.  ¶ 103.

In its quarterly report for the third quarter of 2018, the Company finally disclosed that the collateral was secured by four loans, ¶ 73, and recorded an impairment of $35.1 million on the Loans in its SEC Form 10-Q dated November 9, 2018, ¶ 72, thus valuing the Hotel at $225.1 million.   ¶ 77.   According to the Company, this revised "recapitalization" value was based on the expected sale price of the Hotel.  ¶¶ 72–73. Notwithstanding this significant impairment, Defendant Patel told investors that "'the forecasted NOI for this particular hotel is up approximately 70% from its initial 2018 budget.'"  ¶ 76.  Yet as of November 9, 2018, based on the Company's own valuation approach (*i.e.*, the direct capitalization approach), *see* Scudieri Decl., Ex. D at 32, the Company knew but did not disclose that the fair value of the Hotel was less than $132 million, materially less than its revised 3Q18 valuation of the Hotel at $225.1 million. ¶ 78.

In its quarterly report for the fourth quarter of 2018, the Company recorded an impairment of $18.8 million on the Loans in its SEC Form 10-K dated March 1, 2019, ¶ 79, thus valuing the Hotel at $206.3 million.  ¶ 87.  According to the Company, this revised valuation was based on "the estimated proceeds to be received from the borrower following the sale." ¶ 79.   In direct response to an investor's question concerning future impairments on the Loans, Defendant Traenkle stated, "'[T]he risks are very low.'"  ¶ 84.  Yet as of March 1, 2019, based on the Company's own valuation approach (*i.e.*, the direct capitalization approach), *see* Scudieri Decl., Ex. E at F-30, the Company again knew but did not disclose that the value of the Hotel was less than $132 million, materially less than its revised 4Q18 valuation of the Hotel at $206.3 million. ¶ 87.

At 2Q19, the Company recorded a staggering impairment of $104.3 million on the Loans in its SEC Form 10-Q dated August 8, 2019, ¶ 90, thus valuing the Hotel at $102 million—a reduction of more than 60 percent in a matter of 15 months.  ¶ 94. According to the Company, this revised valuation was based exclusively on receipt of

"lower bids from potential buyers than originally anticipated," ¶ 91. Yet, as of August 8, 2019, the borrower had not received any bids on the Hotel, and the Company knew but did not disclose that the value of the Hotel was less than $102 million, *see* Scudieri Decl., Ex. G at 30. ¶ 94. The Company also knew but did not disclose that it planned to take an impairment of nearly 50% in the following quarter. *Id.*

Finally, at 3Q19, the Company took another impairment of $50 million on the Loans in its SEC Form 10-Q dated November 8, 2019—nearly halving the valuation of this historic property in a matter of just three months, *see* Scudieri Decl., Ex. H at 30. ¶ 95. All told, the Company's astonishing series of impairments on the Loans totaled approximately $208 million over the course of approximately 18 months, on a storied hotel property in a prime location. ¶ 96. All the while, the Company purported to ascribe the Hotel an original valuation of $260 million, so that this string of impairments was tantamount to a series of disclosures that the Company knowingly or with deliberate recklessness had overvalued the Hotel by over 400%, all unbeknownst to unsuspecting investors. ¶ 97.

### III.   STANDARD ON MOTION TO DISMISS

"A motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1179 (N.D. Cal. 2004) (citation omitted). In evaluating a Rule 12(b)(6) motion, the Court "will accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs." *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1094 (9th Cir. 2011) (internal quotation marks and citation omitted). Dismissal is "inappropriate unless the complaint fails to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### IV.   ARGUMENT: RELIANCE

The AC alleges that Plaintiffs relied on materially misleading omissions in the Company's Registration Statement (¶¶ 103–04, 106), and on materially false and

misleading statements and omissions in subsequent SEC filings and investor calls (¶¶ 108, 110, 112, 114, 116, 118, 120, 122, 124, 126, 128, 130–32, 134, 136, 138, 140, 142, 144, 146, 148).

### A. Plaintiffs Have Adequately Pleaded Reliance for Omissions in the Registration Statement under *Affiliated Ute*

Plaintiffs have adequately pleaded the element of reliance on misleading statements in the Registration Statement because the AC expressly pleaded that these statements were misleading primarily by omission. "A presumption of reliance is generally available under *Affiliated Ute* for plaintiffs alleging violations of Section 10(b) and Rule 10b–5 based on 'omissions of material fact.'" *In re Volkswagen 'Clean Diesel' Mktg., Sales Pracs., & Prods. Liab. Litig.*, 328 F. Supp. 3d 963, 973 (N.D. Cal. 2018) (quoting *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999)). Accordingly, "*Affiliated Ute* allows reliance to be presumed 'when the information withheld is material.'" *Id.* (quoting *Desai v. Deutsche Bank Sec. Litig.*, 573 F.3d 931, 941 (9th Cir. 2009)).[1]

The AC alleges that the Registration Statement made statements that were materially misleading primarily by omission. The AC plainly alleges that "in the Registration Statement and Prospectus, the Company implied that the value of the Hotel was equal to the Hotel loans' outstanding principal amount," ¶ 56 (*i.e.*, approximately $260 million (¶ 58)), yet that "Defendants *omitted to state* that at the beginning of 2018, the Hotel had a projected annual NOI that, even with a 70% improvement, would result in a fair valuation of the Hotel that would require the Company to record material provisions for loan losses," ¶ 103 (*i.e.*, a fair valuation of $132 million) (emphasis added).

---

[1] Defendants do not dispute, and so concede, that the allegedly omitted information was material to investors.

Defendants argue that the *Affiliated Ute* presumption does not apply because the AC fails to allege omissions in the Registration Statement.  Defs.' Mem. at 8.  Defendants' argument merely ignores the express allegations of omissions noted above.  Defendants' argument likewise fails altogether to explain why the alleged misleading statements in the Registration Statement are blatant misstatements rather than statements misleading by omission.  Understandably so; they are clearly the latter.

**B.     Plaintiffs Have Adequately Pleaded Reliance for Statements After the Registration Statement**

**1.     The AC Adequately Pleads Reliance for Statements Made after the Registration Statement under *Basic***

The AC adequately pleads reliance for statements made after the Registration Statement because the AC adequately pleads that the shares traded in an efficient market and that members of the Class relied on that market efficiency, and so pleads that the requirements for the presumption of reliance under *Basic* have been met.  The AC alleges that the "Company's securities trade in an efficient market on the New York Stock Exchange under the ticker symbol 'CLNC'."  ¶ 19.  The AC alleges further that "Plaintiffs and members of the Class have suffered damages in that, in reliance on the Defendants' statements and the integrity of the market, they paid artificially inflated prices for Colony Credit's securities," and would not have done so "if they had been aware that the market prices of Colony Credit's securities had been artificially and falsely inflated by the Defendants' false and misleading statements."  ¶ 179.  Accordingly, under the presumption of reliance in *Basic*, the AC adequately pleads reliance for statements made after the Registration Statement.  *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1198–99 & n.80 (C.D. Cal. 2008) (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 247 (1988)).

**2.      Plaintiffs Allege that Members of the Class Purchased Shares in Reliance on the Misrepresentations, and Plaintiffs Are Permitted to Represent Them**

While Lead Plaintiffs only acquired shares in the Merger, Lead Plaintiffs appropriately bring the Action on behalf of all investors who purchased or acquired their shares during the Class Period and after its issuance. AC at 1. Plaintiffs in putative class actions are permitted to represent and to bring claims on behalf of absent class members who purchased shares following later misstatements, even if the named plaintiffs did not. *See, e.g.*, *In re Verisign, Inc.*, No. C 02-02270, 2005 WL 88969, at *4 (N.D. Cal. Jan. 13, 2005) ("Simply because certain class members were injured by misrepresentations that came after the Lead Plaintiffs had already acquired Verisign stock does not mean that the Lead Plaintiffs cannot represent the class."); *Alfus v. Pyramid Tech. Corp.*, 764 F. Supp. 598, 606 (N.D. Cal. 1991) (a class period in securities class actions "is not confined to that period preceding [plaintiffs'] final purchase of [company] stock; carving out such a period would be arbitrary.").[2]

Defendants argue that Plaintiffs "could not have relied on statements made after the [Merger] because . . . Plaintiffs had already acquired their Colony Credit stock," so

[2] Moreover, any question of whether Plaintiffs may assert the rights of others who have similar, but not identical, interests, is a question for class certification, not for a motion to dismiss. *See Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at *25 (N.D. Cal. Dec. 18, 2017) ("The 'class certification approach' requires the Court first to determine whether at least one named class representative has Article III standing, and then defers until the class certification stage the question of whether that individual has the representative capacity to assert the rights of others who have similar, but not identical, interests."); *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 955 (N.D. Cal. 2018) (quoting *Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015)) ("'[A]ny issues regarding the relationship between the class representative and the passive class members—such as dissimilarity in injuries suffered—are relevant only to class certification, not to standing.'")

that Plaintiffs "do not have a 10b–5 claim for anything Defendants said or did after the merger." Defs.' Mem. at 6. While it is true that Plaintiffs' own claims are based on shares they acquired in the Merger, pursuant to misleading omissions in the Registration Statement, Plaintiffs sensibly seek to represent a Class of investors that includes individuals who purchased shares after the Merger, pursuant to subsequent SEC filings that contained misstatements and omissions substantially similar to those in the Registration Statement. Such representation is wholly legally proper, *In re Verisign, Inc.*, 2005 WL 88969, at *4, and in any event, is a question to be decided at the class certification stage. *See Welgus*, 2017 WL 6466264, at *25; *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1004 (N.D. Cal. 2008) (Lead Plaintiffs represent "some claimed injuries of the class" they intend to represent, which is "all that is required at this stage of the litigation").

## V.   ARGUMENT:  MISSTATEMENTS OR OMISSIONS

### A.   The Company Made Materially False Statements or Omissions about Its Valuation

#### 1.   The Company Made Material Omissions about the Value of the Row Hotel in the Registration Statement

The Complaint adequately alleges that Defendants misleadingly omitted material facts in the Registration Statement by implying that the value of the hotel was approximately $260 million, but omitting to state that "at the beginning of 2018, the Hotel had a projected annual NOI that, even with a 70% improvement, would result in a fair valuation of the Hotel that would require the Company to record material provisions for loan losses." ¶ 103.

As explained above, § II(B), in the Registration Statement, the Company led investors to believe that it would record loan impairments if the fair value of the underlying collateral was less than the net carrying value of the loan. The Company told investors that an "appropriate methodology" for determining the fair value of hotels

was the direct capitalization method. Accordingly, the Registration Statement implied to investors that under the methodologies the Company itself believed to be appropriate in determining a fair valuation of the Hotel, including the direct capitalization approach, the value of the underlying collateral was not less than the net carrying value of the Loans.

In fact, under the direct capitalization approach, the value of collateral underlying the Loans, namely the Hotel, was far less than the carrying value of those loans.[3] While leading investors to believe otherwise, the Company omitted to state that, under a methodology the Company told investors it believed to be "appropriate for valuing assets similar to [hotels owned by the Company]," the direct capitalization approach, the loan collateralized by the Hotel was impaired. ¶ 103. The Company likewise omitted to state that under that approach, the Company knew in January 2018 that the fair value of the Hotel was less than $132 million, ¶ 71, substantially less than the $260 million valuation ascribed in the Registration Statement. ¶¶ 103–07. By omitting this information, the Company's statements implying that the value of the hotel was approximately $260 million were false and misleading.

Defendants argue first that "Plaintiffs do not allege any connection between [the January 2018] budget forecast and the Company's views" concerning "the Row Hotel's value." Defs.' Mem. at 11. Defendants are incorrect. As explained above, Plaintiffs clearly and repeatedly connect the January 2018 budget forecast and the Company's

---

[3] Under the direct capitalization method, market value is calculated as an amount equal to annual net operating income divided by the capitalization rate. *See, e.g.*, *In re Valley Health Sys.*, 429 B.R. 692, 730 n.89 (Bankr. C.D. Cal. 2010) (distinguishing direct capitalization method from discounted cash flow method). Accordingly, and as alleged in the AC, the Company valued the Row Hotel in the beginning of 2018 by using the Company's net operating income and a constant (the capitalization rate). ¶ 64 & n.11. That is, the Company valued the Hotel in January 2018 by relying almost entirely on one variable (*i.e.*, net operating income) that, if increased 70%, would amount to a valuation of the Hotel that would result in a $35 million impairment.

views of the Hotel's value, ¶¶ 52–56, 59, 61, 63–64, 67–68, 70, 72–74, 76–77, 79–81, 83–86, 89–93, 95–96.  The Company told investors what the Company believed to be an appropriate method for valuing real estate, the direct capitalization approach, *see* Scudieri Decl., Ex. A at F-16; *id.*, Ex. B at 29; *id.*, Ex. C at 31; *id.*, Ex. D at 32; *id.*, Ex. E at F-30; *id.*, Ex. F at 29; *id.*, Ex. G at 30; *id.*, Ex. H at 30, and the variable for that calculation is the Company's NOI, calculated in the January 2018 forecast.  ¶¶ 63–64, 71, 78, 87, 94.

Defendants next argue that the AC fails to plead various facts about the January 2018 forecast.  *First*, Defendants argue that the AC does not allege that the Company completed a valuation of the Hotel in January 2018.  The AC clearly does:  the AC alleges (1) that the Company conducted assessments of the adequacy of loan loss reserves "at least quarterly or more often as needed," ¶¶ 59, 74, 126, and (2) that such assessment involved a valuation of the collateral underlying the loans.  *Id.  Second*, Defendants argue that the AC fails to allege when the Hotel conducted its initial 2018 assessment of NOI.  In fact, the AC clearly alleges that the Hotel conducted this analysis at the beginning of the year:  on August 7, 2018, Defendant Patel stated that "2018 projected NOI [net operating income] has increased approximately 70% *from the beginning of the year*," ¶¶ 64, 68, and on November 6, 2018, Defendant Patel stated that "the forecasted NOI for this particular hotel is up approximately 70% from its *initial* 2018 budget."  ¶ 76.  By Patel's own words, the Hotel projected NOI for 2018 at "the beginning of the year" in "its initial 2018 budget."  *Third*, Defendants argue that the AC fails to allege "what [the initial 2018 budget] referred to," but the AC repeatedly alleges that the relevant analysis to which Patel was referring was "the forecasted NOI" for 2018.  As used in this context, "NOI" is a widely understood accounting term of art meaning "net operating income," which refers to a specific line item in an income

statement.[4]  *Fourth*, Defendants argue that the AC fails to allege "who set the budget, or who received it."  Who set the budget/forecast is irrelevant.  As for who received the forecast, Patel himself made clear that he received it, and in any event the Company had to have received it in the first quarter of 2018 in order to conduct its quarterly valuations of potential loan impairment based on projected income.  ¶¶ 59–61.

Defendants also argue that there are insufficient allegations to show that the Company improperly valued the hotel under a valuation based on discounted cash flow.  As an initial matter, the Company stated in the Registration Statement that *both* the direct capitalization approach *and* the discounted cash flow analysis were "appropriate" methods of valuing properties like the Hotel.  Scudieri Decl., Ex. A, at F-15–16.  The Company therefore made a material omission to investors when it implied the Hotel had a certain value, yet knew that one of these "appropriate" approaches for valuing the Hotel resulted in a valuation that was roughly half of the value the Company ascribed to it.  Even more tellingly, it is clear from the Company's own statements in later filings that it valued the Hotel, like other real estate assets, using the direct capitalization method.  *See, e.g.*, Scudieri Decl., Ex. A at F-16; *id.*, Ex. B at 29 (1Q18 10-Q); *id.*, Ex. C at 31 (2Q18 10-Q); *id.*, Ex. D at 32 (3Q18 10-Q); *id.*, Ex. E at F-30 (2018 10-K); *id.*, Ex. F at 29 (1Q19 10-Q); *id.*, Ex. G at 30 (2Q19 10-Q); *id.*, Ex. H at 30 (3Q19 10-Q).

In any event, the second method for valuing the Hotel (not actually used), the DCF method, is likewise based on projected income, and so would likewise result in a valuation of the Hotel that showed it to be grossly overvalued.  Defendants argue that the DCF method is based on a five-year projection, Defs.' Mem. at 11, but that self-serving assertion about the industry understanding of the DCF method is a factual matter

---

[4] *See, e.g.*, Letter from Steven A. Wechsler, Pres. & CEO, National Ass'n of Real Estate Inv. Trs. (NAREIT), to Elizabeth M. Murphy, Secretary, Sec. & Exch. Comm'n, *Companies Engaged in the Business of Acquiring Mortgages and Mortgage-Related Instruments*, at App'x A, SEC Release No. IC-29778, 2011 WL 5854559, at *4 (Sec. & Exch. Comm'n Nov. 7, 2011).

that Plaintiffs dispute. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*, 139 S. Ct. 2615 (2019) (explaining "the fundamental rule that courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage."). In any event, the Company valued the Hotel using the direct capitalization method, so this improper factual dispute is a distraction.

Defendants' reliance on *Align Tech* is misplaced. *See* Defs.' Mem. at 12–13. In *Align Tech*, the district court concluded that the plaintiff's "opinion as to how [the company] could have or should have calculated the fair value of its reporting units" were "not a substitute for facts describing how [the company] actually conducted its analysis." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech, Inc.*, 65 F. Supp. 3d 840, 852 (N.D. Cal. 2014), *aff'd*, 856 F.3d 605 (9th Cir. 2017). The district court found that plaintiffs failed to "plead facts indicating that the major assumptions Plaintiff selected were the only assumptions that went into [the company's] analysis, especially in view of [the company's] disclosures of a number of other factors informing its . . . analysis, such as historical data." *Id*. at 853.

In sharp contrast, Plaintiffs here do plead "facts indicating that the major assumptions Plaintiff selected were the only assumptions that went into [the company's] analysis . . . ." *Id.* Plaintiffs plead that the Company told investors that it would take an impairment on a loan if a single factor were met—if the value of the collateral underlying the loan were determined to be less than the carrying value of the loan. Scudieri Decl., Ex. A at F-1-79, G-1-83. Likewise, the AC does not opine on how Colony Credit "could have or should have" valued the Hotel; instead, the AC expressly alleges how Colony Credit "actually conducted its analysis"—the Company disclosed the methodology it used for valuing real estate assets like the Hotel, namely, the direct capitalization approach. *See* Scudieri Decl., Ex. A at F-16; *id.*, Ex. B at 29; *id.*, Ex. C

at 31; *id.*, Ex. D at 32; *id.*, Ex. E at F-30; *id.*, Ex. F at 29; *id.*, Ex. G at 30; *id.*, Ex. H at 30.

### 2. The Company Made Material Omissions about the Value of the Row Hotel in its Post-Merger SEC Filings

In the Company's SEC Forms 10-Q dated May 18 and August 9, 2018, the Company told investors that the sole basis for its decision not to impair the Hotel Loans rested on the valuation of the underlying collateral—the Row Hotel—because it "believe[d] sufficient collateral value exist[ed] to cover the outstanding loan balances." ¶¶ 58, 67. In its quarterly and annual reports, the Company made clear that it valued real estate using the direct the capitalization method. Under this approach, the Company valued the Row Hotel at $132 million. ¶¶ 64, 71.

Beginning with its SEC Form 10-Q dated November 9, 2018, and in all subsequent impairment announcements, the Company stated that it was impairing the Loans for various reasons, yet the Company failed to disclose that the Company itself valued the Hotel at far less. ¶¶ 76–78, 87, 94–97. In discussing the Loan impairments, the Company omitted to disclose that the Company itself valued the Hotel at far less than the amount of the impairments implied, and so the Company failed to disclose the whole truth, rendering the statements misleading. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth, even when there is no existing independent duty to disclose information on the issue or topic.") (internal quotation marks and citations omitted) (alterations adopted); *see also Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (holding that Company's reassuring investors that FDA approval process was going well, when Company knew FDA approval would never materialize, was materially misleading).

Defendants argue that because the Company employed "various factors" to ascertain "whether loan investments need to be impaired," the AC fails to allege that

the Company's post-Merger statements were materially false or misleading. Defs.' Mem. at 13–14. In fact, as explained above, in the Company's SEC Forms 10-Q dated May 18 and August 9, 2018, the Company made clear that, at least with respect to the Hotel, the Company chose not to impair the Hotel Loans because of their valuation of the Hotel collateral—not due to "various factors." ¶¶ 58, 67. In the Company's subsequent impairment announcements in SEC filings on November 9, 2018, March 1, 2019 and August 8, 2019, as explained above, the Company failed to disclose that it valued the Hotel at far less than the amount of the impairments implied, so the Company's impairment statements were misleading for failing to disclose the whole truth.

> **3.** **The Company's Misrepresentations and Omissions Concerning its Valuation of the Row Hotel Were Misleading Not Because *Plaintiffs* Valued the Hotel at Less, but Because *Defendants Themselves* Valued the Hotel at Less**

The Company's misrepresentations and omissions concerning its valuation of the Hotel were misleading, not because the Hotel was worth less according to some methodology preferred by Plaintiffs, but rather because the Hotel was worth less according to the methodology Defendants themselves used to value the Hotel and other real estate assets. ¶¶ 56, 58, 64, 67, 71, 76–79, 84, 87, 91–97, 103–07. "Even when framed as an opinion, a reasonable investor 'expects not just that the issuer believes the opinion (however irrational), but that it fairly aligns with the information in the issuer's possession at the time.'" *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *16 (N.D. Cal. June 2, 2020) (quoting *Align Tech., Inc.*, 856 F.3d at 615).

Defendants argue that the Company's statements about valuation are opinion statements and thus inactionable. Defs.' Mem. at 21–22. Even if the Company's valuation statements are opinion statements, the statements are straightforwardly actionable because the Company itself did not believe the statements to be true when it

made them, and in any event, the statements did not fairly align with the information in their possession. Under Defendants' own methodology for valuing the Hotel, the Hotel was worth materially less than Defendants led investors to believe. *See Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, 2020 WL 2559939, at *5 (N.D. Cal. May 20, 2020) (citing *Align Tech., Inc.*, 856 F.3d at 615). *See also Karinski v. Stamps.com, Inc.*, 472 F. Supp. 3d 747, 751 (C.D. Cal. 2020) (statements that "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists" are actionable) (alterations adopted) (citing *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017)).

This case is nothing like cases cited by Defendants, in which courts found plaintiffs merely to disagree with Defendants' valuation. In *Burr*, for example, the plaintiffs merely alleged that the defendant corporation "should have made a provision for loss on [certain] loans sooner than it did," but "fail[ed] to plausibly allege subjective falsity." *Burr v. Equity Bancshares, Inc.*, 2020 WL 6063558, at *4–*5 (S.D.N.Y. Oct. 14, 2020). Indeed, the *Burr* court found that the allegations themselves suggested that the defendant corporation "was forthright with investors." *Id.*, at *6. Here, by contrast, the AC explains in detail how and why the Defendants knew but failed to disclose that the valuation of the Hotel securing the Loans was materially overstated at all times, and that the Company knew but failed to disclose that significant future loan impairments would be required in subsequent reporting periods to account for the Hotel's true valuation. ¶¶ 56, 58, 64, 67, 71, 76–79, 84, 87, 91–97, 103–07. Quite unlike *Burr*, Plaintiffs here are not alleging that the Defendants "should have" done anything other than to report truthfully and accurately the results of the valuation analyses that the Company led investors to believe it had actually conducted on the Hotel in determining whether to impair the Loans at each reporting period. *See id.*

Defendants' reliance on *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148 (C.D. Cal. 2007), is similarly off-point. There, plaintiffs simply claimed that a specific

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:20-CV-08305-PSG-PVC

18

GAAP provision required the defendant corporation to record a loan impairment upon the happening of certain "events or changes in circumstances." *Id.* at 1161 & n.3. The court assumed that plaintiffs' interpretation of the GAAP provision was correct, but dismissed the action because plaintiffs failed to "establish[ ] that those circumstances were present." *Id.* Here, by contrast, Plaintiffs are alleging that the Company knowingly overvalued the collateral securing the Loans and failed to disclose the true valuation of the Hotel in the public statements at issue. ¶¶ 56, 58, 64, 67, 71, 76–79, 84, 87, 91–97, 103–07. This case is nothing like *Wet Seal*, where plaintiffs simply disagreed with the timing of certain loan impairments that had nothing to do with the valuation of any underlying collateral.

Defendants also accuse Plaintiffs of pleading fraud by hindsight. Defs.' Mem. at 17. Their accusation is again mistaken. Plaintiffs allege that, based on figures *in Defendants' possession at the beginning of 2018*, the Company overstated the value of the Row Hotel. ¶¶ 63–64, 71, 78, 87, 94.

## B.    The Company's Statements about the Risk of Additional Impairments Were Materially Misleading

Less than three months before the Company reported a further $100 million impairment on the Hotel Loans in August 8, 2019, Defendant Traenkle told investors that "the risks are very low" of future impairments. ¶ 138. Defendant Traenkle's statement was misleading because it did not "fairly align" with the information in his possession at the time, the Company's valuation of the Hotel suggesting additional impairments were nearly certain. ¶¶ 63–64, 71, 78, 87, 94, 102–49. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188–89 (2015) (a reasonable investor "expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time").

The statements concerned a then-existing or historical analysis of risk, not of future risk, and so they are neither protected by the PSLRA's safe harbor nor are they forward-looking. *Granite Constr. Inc.*, 2020 WL 2559939, at \*7 (citing *In re Quality Sys.*, 865 F.3d at 1142). In any event, contrary to Defendants' assertions, Defs.' Mem. at 22, neither Defendant Patel's nor Defendant Traenkle's statement was accompanied by the requisite "'meaningful' cautionary language" that would entitle Defendants to the statutory safe harbor protection. *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1167 (C.D. Cal. 2003). The Company's boilerplate risk disclosures in its SEC filings are insufficient. *See id.* at 1165 & n.8. ("[C]ourts and Congress have made clear that mere boilerplate cautionary language will not do."). Instead, "'[t]he cautionary language must, within context, be meaningful; boilerplate generalized warnings do not suffice to balance specific predictions.'" *Id.* (quoting *In re Clorox Co. Sec. Litig.*, 238 F. Supp. 2d 1139, 1142 (N.D. Cal. 2002)).

## VI.    ARGUMENT: SCIENTER

A plaintiff adequately pleads scienter when all the facts alleged, viewed holistically, support "a strong inference that defendants made false or misleading statements 'intentionally or with deliberate recklessness.'" *In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1121 (N.D. Cal. 2017) (quoting *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014), *overruled on other grounds by Align Tech., Inc.*, 856 F.3d at 616). "Deliberate recklessness means that the reckless conduct reflects some degree of intentional or conscious misconduct," as when, for example, an actor "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *In re Leapfrog Enter., Inc. Sec. Litig.*, 237 F. Supp. 3d 943, 950 (N.D. Cal. 2017) (internal quotation marks and citations omitted). "In evaluating scienter, the proper inquiry is not whether 'any individual allegation, scrutinized in isolation, meets that standard,' but rather 'whether all of the facts alleged, taken

collectively' satisfy the scienter burden.'" *LendingClub*, 254 F. Supp. 3d at 1121 (quoting *Tellabs*, 551 U.S. at 323).

The AC adequately pleads scienter with respect to the Defendants. *First*, as explained above, the Company stated that, in determining whether loan impairments were appropriate, it assessed the "credit quality of the portfolio and adequacy of loan loss reserves on a quarterly basis or more frequently as necessary." Scudieri Decl., Ex. A at F-1-79 (NorthStar I assets), G-1-83 (NorthStar II assets). For both groups, the Company stated that "[i]f . . . the estimated fair value of the underlying collateral is less than the net carrying value of the loan, a loan loss reserve is recorded with a corresponding charge to provision for loan losses." *Id.* Accordingly, the Company itself valued the Hotel on a quarterly basis and knew its value at all relevant times. The Individual Defendants likewise knew of the Hotel's value. As stated above, on August 7, 2018, Defendant Patel stated that "2018 projected NOI [net operating income] has increased approximately 70% *from the beginning of the year*." ¶¶ 64, 68 (emphasis added). Then, on November 6, 2018, Defendant Patel stated that "the forecasted NOI for this particular hotel is up approximately 70% from its *initial* 2018 budget." ¶ 76. These statements expressly indicated to investors that Defendant Patel was involved with, and knew about, the Hotel's valuation.

*Second*, on February 28, 2019, in direct response to an investor's question whether the Company foresaw any further write-downs on the Loans, Defendant Traenkle stated, "[T]he risks are very low. We've gone through the portfolio extensively kind of asset by asset, loan by loan." ¶ 158. This statement informed investors that Traenkle had "extensively" reviewed each loan in the Company's portfolio, including the Loans, and as such, Defendant Traenkle likewise had first-hand knowledge of the valuation of the Hotel Loans. Moreover, Defendant Traenkle's statement was blatantly misleading, as explained above, and where an officer "affirmatively created an impression of a state of affairs that differed in a material way

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:20-CV-08305-PSG-PVC

21

from the one that actually existed," such statements are strongly probative of scienter under Section 10(b). *Quality Sys., Inc.*, 865 F.3d at 1144 (alterations adopted); *see Leapfrog*, 237 F. Supp. 3d at 950.

*Third*, the size of the overstatement in this case supports a finding of scienter. Indeed, while the scienter allegations above are more than adequate, a plaintiff may adequately allege scienter relying solely on the fact that "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008) (internal quotation marks and citation omitted). The nature of what Defendants misrepresented—the value of the Company's largest loans, (¶¶ 4, 66)—was indeed so central to the Company's operations that it would be absurd to suggest that Defendants did not know about it. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008); *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 943 (9th Cir.), *cert. denied*, 540 U.S. 966 (2003).[5]

Defendants argue that Plaintiffs' scienter allegations are "boilerplate." Defs.' Mem. at 23. They are not: as explained above, the AC alleges highly specific reasons why the Company, and Individual Defendants, clearly knew about valuation of the Hotel Loans and the underlying collateral. Moreover, in general, this is a case where "it would be absurd to suggest that management was without knowledge of" the value

---

[5] *See also In re Qwest Commc'ns Int'l, Inc.*, 396 F. Supp. 2d 1178, 1194 (D. Colo. 2004) ("Allegations of pervasive and long-standing accounting machinations, and resulting misstatements, may support a strong inference of scienter under the PSLRA) (collecting cases); *In re Lernout & Hauspie Sec. Litig.*, 208 F. Supp. 2d 74, 87–89 (D. Mass. 2002) ("sheer magnitude" of the overstatement and "tremendous magnitude of fraud" supported strong inference of scienter); *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 610 (D.N.J. 2001) (finding that plaintiffs adequately pleaded scienter by setting forth "numerous detailed facts to show both that the magnitude of fraud enhanced the suspiciousness of identified transactions or made the overall fraud glaringly conspicuous).

of an asset so critical to the Company that the revelation of its true value caused the Company's share price to drop by over one-third.

## VII.   ARGUMENT:  PLAINTIFFS HAVE PROPERLY PLEADED SECONDARY VIOLATIONS

As Plaintiffs have pleaded primary violations of Section 10(b), Defendants' argument for dismissal of Section 20(a) claims, Defs.' Mem. at 25, fails.

## VIII.  CONCLUSION

For all the above reasons, Defendants' Motion should be denied.

Dated:  April 26, 2021

Respectfully submitted,

POMERANTZ LLP

/s/ Austin P. Van
Jennifer Pafiti
1100 Glendon Avenue, 15th Floor
Los Angeles, California  90024
Telephone:  (310) 405-7190
Facsimile:  (917) 463-1044
Email:  jpafiti@pomlaw.com

Jeremy A. Lieberman (*pro hac vice
   application forthcoming*)
Austin P. Van (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
avan@pomlaw.com

*Lead Counsel for Lead Plaintiffs*

Peretz Bronstein
BRONSTEIN, GEWIRTZ &
   GROSSMAN, LLC
60 East 42nd Street, Suite 4600
New York, New York  10165
Telephone:  (212) 697-6484
Facsimile:  (212) 697-7296
Email:  peretz@bgandg.com

*Additional Counsel for Lead Plaintiffs*